## Circuit Court U. S.

## NEW-YORK, APRIL, 1806.

Present, the Hon. MATTHIAS B. TALMADGE.

The People
v.
William S. Smith. } CONSPIRACY.

Counsel for the prosecution, *Nathan Sanford*, District Attorney, and *Pierpont Edwards*.

Counsel for the Defendant, *Washington Morton, Cadwallader D. Colden, Josiah Ogden Hoffman, Thomas Addis Emmet* and *Richard Harrison*, Esquires.

On Tuesday the 8th of April, Messrs. Ogden and Smith, being separately called upon to plead to their indictments, respectively put in their pleas in abatement, verified by affidavit, which pleas were substantially as follows : That the grand jury, by whom the bill of indictment was found, previously to the finding thereof, had before them illegal testimony, and such as, by the laws of the land, ought not to have been before the said grand jury previously to their

finding the said bill of indictment; and that the said defendant, on the first day of March last past, was arrested by virtue of a warrant issued by the honourable Matthias B. Talmadge, Esq. district judge of the United States for the district of New-York, and thereupon carried before the said judge, and was then and there sworn and examined by the said judge touching the supposed offences charged in the said indictment, and was then and there illegally, and against his will, forced and compelled by the said judge to answer certain questions touching the said supposed offences, in the said indictment contained, which said examination and deposition of the said defendant were reduced to writing by the said judge, and the said defendant was then and there by the said judge illegally, and against the will of him the said defendant, compelled to sign the same, and to swear to the same as the same were so reduced to writing and signed, and that the deposition in writing of one (the defendant in the other cause) taken before the said honourable Matthias B. Talmadge, Esq. in the absence of the said defendant, together with the aforementioned legal deposition and examination of him the said defendant, were, before the said indictment was found, illegally laid before, and were before the grand jury, who found the said bill of indictment, and this he is ready to verify, &c.

After these pleas had been filed, the district attorney prayed time until the next day to consider what measures he should adopt, which was immediately granted by the court, without any opposition on the part of the defendants.

On the next day, the district attorney filed his demurrers to those pleas; and the counsel for the defendants prayed time to join in demurrer till the next day, in order that they might be prepared for the argument.

The discussion relative to postponement of the argument on the demurrer, was then renewed. Mr. Emmet stated, that from the nature of the facts set forth in the pleas, he had rather expected the district attorney would have taken issue on them, than admitted them by demurrer; that therefore the whole of his attention, and he believed also of that of his associate counsel, had hitherto been directed to the best manner of supporting the plea before a jury; that therefore the demurrer was a surprise upon him, and he was not prepared to argue it, except on the general principles which first suggested to the defendant's counsel the propriety of the plea. He observed further, that no objection had been made to indulging the district attorney with time for consideration yesterday, because the pleas were probably not expected by him; and there was no wish on the part of the defendant's counsel to obtain an advantage by surprise.

The court then observed, that if the defendant's counsel were really unprepared, they should be indulged with time till the afternoon, but no longer; and at half past twelve adjourned till three o'clock.

The sitting of the court being resumed, the district attorney began by stating some *formal* objections to the plea, which it is unnecessary to mention here, as the judgment of the court was founded exclusively on the general objection on the merits, that no such plea would lie.

The People
v.
Smith.

On this general question he argued, in support of the demurrer, that this plea was a perfectly novel experiment, for which no precedent or authority could be found. This very novelty was conclusive evidence that it would not lie; for otherwise it is inconceivable that it should not have been made use of before now. It manifestly appears, from the silence of all the elementary writers, that there can be no such plea in abatement. Lord Hale (2 Hale's Pl. Cr. cap. 30, p. 236) details all those pleas, among which such as this is not to be found. They are, according to him, 1st. Such defects as arise upon the indictment itself, and the insufficiency of it. 2d. Such defects as are in matters of fact, *as misnomer or false addition of the prisoner;* and 3d. By matter of record. The acts of grand juries are not to be brought into court and questioned in this way; they are independent and irresponsible; they judge for themselves of the testimony upon which they ought to find indictments, and no one has a right to inquire; nor has he, without a violation of the grand juror's oath, the means of knowing what evidence they may have had before them. No injury can result from this; for it is the duty of the grand jury to decide on *ex parte* evidence; and if they decide wrong, or prefer a false charge, the natural and the only remedy is, that the accused will be acquitted on his trial before the petty jury. The object of the grand jury is only to judge whether there is probable cause for putting a party to answer a charge, and therefore it should not be bound down to the same strictness of investigation as the tribunal which is ultimately to decide upon the charge. The counsel for the defendant have probably been led to adopt this step, by Dr. Dodd's case; (1 Leach's Cases in Crown Law, 184.) but in truth it is an argument against them; for it is no precedent of a plea in abatement. If such a plea would have lain, why was it not adopted in that case? On the contrary, the matter there submitted to the court, was laid before it on a summary application; which clearly shows, that the prisoner's counsel had no idea it could be taken advantage of in any other way.

The defendant's counsel replied as follows:

Among the authorities cited on the opposite side, is the arrangement in 2 Hale's Pl. Cr. chap. 30, p. 236, of pleas in abatement of the indictment; and from the circumstance that a plea similar to that now under discussion is not found there, it is inferred, that no such plea can exist. But it appears that Lord Hale's arrangement has not been very accurately examined. He classes those pleas as follows: 1st. On such defects as arise upon the indictment itself and the insufficiency of it. 2d. Such defects as are in matters of fact, as misnomer or false addition of the prisoner; and, 3d. By matters of record. Now, we do not see why our plea does not come under the *second* of those heads; for it is a mistake to confine that head merely to misnomer or false addition of the prisoner. The arrangement comprehends pleas from such defects as are on the face of the indictment itself, which perhaps more properly ought to be called demurrers; 2d. Such as arise from matters *dehors* the indictment *in pais;* and, 3d. From matters *dehors* the indictment *of record*—comprehending every possible matter that can arise. Is not the circumstance alleged in our plea, that illegal evidence has been offered to the grand jury, if it be true matter of fact and *dehors*

the indictment? And does it not exactly class itself under the second head of Lord Hale's arrangement? If it does not, and that head must be considered as comprehending only the two cases that appear to be mentioned, merely for the purpose of illustration, then his classification is insufficient, and in proof of that assertion we specify a plea in abatement unquestionably good, which is equally excluded from his arrangement. This is to be found in Bro. Abr. title, Indictment 2. " Note, that where a man is indicted of felony by those, of whom part are indicted or outlawed of felony, and others acquitted by pardon, so that they are not *probi nec legales homines*, there it was agreed, that the indictments by them presented shall be void, and the parties who are indicted shall not be arraigned on this; *and note, that this matter ought to be pleaded by him who is arraigned on this indictment, before he pleads to the felony.*" On this quotation, let it be observed for the present, that it furnishes proof of a plea in abatement arising from matter of fact, *dehors* the indictment, and not from misnomer or false addition of the prisoner, but from matter relative to the grand jury; and it is therefore so far precisely parallel to that before the court. Having thus endeavoured to set aside the respectable authority of Hale, if it could be considered as furnishing any argument against us, let us proceed to consider the general principles on which our plea can be supported.

It is a fundamental doctrine in the law, that there is no wrong without a remedy, and no right without the means of enforcing it. Apply that to the present case. Is it not a wrong to be accused and subjected to prosecution on illegal evidence; to be injured in character, in peace of mind, and in the trouble and expense of defending one's self against an indictment, which by the rules of evidence and law ought not to have been found? If so, what is the remedy? Is it not the right of every man that he shall not be put to answer to an indictment, unless it shall have been found according to the rules of law? And if so, what are the means of enforcing that right? A grand jury, it is true, ought to listen only to *ex parte* evidence; but that should be of such a nature as would be received to support the prosecution before a petty jury, and such as, if uncontradicted and unexplained, would induce a conviction. The rules of evidence, are the result of accurate reasoning, and of a strict regard to the rights of those, whose persons or property are to be affected. That reasoning is equally accurate, and those rights ought to be equally sacred, whether the investigation be before a grand or petty jury. Those rules of evidence are not the result of any statutory regulations, but are adopted on account of their wisdom, justice, and universal applicability. What is there in the nature of grand juries, in the purposes for which they were instituted, or the objects they are to attain, that ought to enfranchise them from those rules of wisdom and of justice, which are also of universal applicability?

But the attorney general insists, that grand juries are independent and irresponsible; judging for themseves as to the grounds on which they will prefer an accusation, and that no one has a right to investigate or to know what evidence they have had before them. This doctrine is broadly denied; and we do so from regard to an institution, which we have been habituated to love, and do not wish

at this day to learn to detest. Grand juries are the offspring of free government; they are a protection against ill-founded accusations; and the necessity of their originating bills of indictment, is supposed to be infinitely more friendly to liberty, than the mode of proceeding by information; but if their powers were of such a nature as we have heard described, we should advise the friends of freedom and security to seek for the abolition of such an odious institution, and to throw themselves at once upon the mercy of the public prosecutor. What frightful privileges is it alleged to possess? Hearing only *ex parte* evidence, secret in its deliberations—irresponsible for its decisions, and bound in its investigations by no rules of law! Does this fall short of what we have heard or read of respecting the most despotic tribunals in the most enslaved countries? The powers which it in fact possesses, of deciding only on the evidence for the prosecution, and of keeping its deliberations secret, are in themselves sufficiently serious; but they are controuled and prevented from becoming dangerous by this, that it is bound to investigate according to the rules of law. It is at liberty to range through the wide extent of the community in pursuit of crime; but it is confined to travel in its pursuit only by the established paths of evidence.

From whence too does the attorney general infer, that grand juries are irresponsible? Is it from the power anciently claimed by judges of fining them for misconduct? We do not pretend to say that such a power ought to be revised—but the frequent exercise of it in former times, shows that their acts have always, from the earliest periods, been considered as subject to investigation and punishment; and at this day it will not surely be questioned, that if a grand jury grossly misconducted itself from corrupt motives, the members so offending might be prosecuted by information or indictment, as is specified in 2 Hale's Pleas of the Crown, 159–60; where he also mentions the 3 Hen. 7. c. I. empowering justices of peace, oyer and terminer, or gaol delivery, to impannel another inquest to inquire of the concealments of a former one, for the purpose of punishment.

If they are not irresponsible, and that their acts may be inquired into, let us see whether there be any thing in the secrecy of grand jury proceedings, to prevent our being at liberty to alledge that illegal evidence was offered to them. It might perhaps be advisable to ascertain with more precision than is already done, in what the secrets should really consist—but without entering into any discussion of the kind, it may be sufficient to observe that although the sentiments expressed by jurors, and the facts disclosed by witnesses to them, are secrets, the names of those witnesses never can. Those are facts which any man may learn, by placing himself at the door of the grand jury room, or by looking at the names indorsed on the bills after they are found. We may say further, that no *unlawful act* done in the grand jury, is such a secret as jurors are bound by their oaths to keep. If a bill of indictment were found by less than twelve of the jury, surely no man is restrained from disclosing that. If a bill of indictment be found in another unlawful way, by the admission of illegal evidence, is that violation of law more protected by the obligation of secrecy? It would be competent to him against whom an indictment had

been found by only eleven jurors, to avail himself of that fact, and to get rid of the accusation—why is it not equally competent to the man, who is indicted on evidence which the grand jury ought not by law to have received, to insist for the same purpose on the illegality of this procedure ?

We have established that grand juries are not independent of either the law or the court; let us now eximine whether they are exclusively competent to judge for themselves as to the grounds on which they will prefer an accusation. To that doctrine may be opposed the well-known maxim " *ad quæstiones legis respondeant judices, ad quæstiones facti, juratores.*" That maxim so accurately marks the distinct and constitutional provinces of judges and juries, that we cannot hesitate to apply it equally to grand as to petty juries. They are each of them subordinate parts of the criminal system obviously instituted for the ascertainment of facts; and, as to matters of law, under the guidance and controul of those with whom is deposited the interpretation of the law. If then it shall at any time in the course of the proceedings appear to the judges, that the grand jury are about to err, or have erred in matter of law ; in the first case, the court will prevent their error, by giving them proper information ; in the other case, where an error has been actually committed, the court will interfere, and prevent any injurious consequences from the mistake. Every day's experience shows us grand juries applying to the court for advice in matter of law, and the court directing them as of right and as a part of its duty. There are two cases which immediately present themselves, and are illustrative of those two positions. In the one, the court prevented the error which the jury was about to commit; in the other, if the alleged error had been actually committed, the court manifestly would have interfered, and prevented any injurious consequences from the mistake. The first is Denby's case, 2 Leach's Cr. Ca. 530.; the other is Dr. Dodd's case, 1 Leach's Cr. Ca. 184., and both prove that illegal evidence shall not be permitted to go before the grand jury. In Denby's case, that body, suspecting Denby himself (who was examined as a witness before it against one Edwards) of prevaricating, applied to the court for his depositions taken before the magistrate, pursuant to the statutes of Philip and Mary. But the court refused, because while Denby could be had, they were only secondary evidence, and would be therefore illegal. The judges did not say to the jury, " You are independent and irresponsible, and you must decide for yourselves as to the grounds on which you will find indictments; therefore, as you ask for those dispositions, take them, though they are not strictly legal evidence." No ; their answer substantially establishes, that whatever is not legal evidence, shall not go before the grand jury, and that it is not that body, but the court, which is to decide on the legality of the evidence on which an indictment is to be found. In Dr. Dodd's case, he stated to the court, when called upon to plead, that the indictment was found on the testimony of an incompetent witness. Did the court answer—" with that we have nothing to do; the grand jury only is competent to decide as to the evidence on which it will find indictments? No; the judges instantly received the objection, and determined, that if the grand jury had found a bill on illegal evidence, they would interfere and prevent any injurious consequences to the

NEW-YORK, 1806.

The People
v.
Smith.

NEW-YORK,
1806.

The People
v.
Smith.

prisoner.  The point was argued by some of the most able lawyers at the bar, and submitted to the twelve judges ; and it was only because they decided that the witness was competent and the evidence legal, that the objection did not avail—from which it manifestly results, that where the evidence on which a bill of indictment has been found, is confessedly illegal, the court should interpose, and prevent the accused's sustaining any injury from the error of the jury.

But, says the attorney general, if a grand jury do wrong, and find an indictment on illegal evidence, the remedy and the only remedy is, that the accused will be acquitted on his trial, before the petty jury.  That this is not the *only* remedy, is clearly established by the two cases last cited.  Let us farther examine, whether it be *any* remedy for the wrong done to a citizen by being illegally indicted.  Suppose a case of misery often witnessed; a wretch, after being indicted, unable to find bail—or a man indicted of a felony, in which bail would not be received ; suppose farther, what not unfrequently happens, a court limited like this as to the duration of its sittings, and so pressed with business, that part must be postponed—would it be any remedy to a man illegally indicted, and obliged to remain in prison till September next, that in September next he would be acquitted and discharged ?  Is such an acquittal a remedy for a moment's imprisonment, for anxiety of mind, derangement of affairs, suspension or loss of character ?  If not, we revert to the established maxim, " there is no wrong without a remedy," and ask, in this case, what is the remedy ? or, at least, what is the remedy exclusive of that which we have adopted ?

But great stress is laid on the novelty of this plea, and on its being entirely without precedent.  Whether it be so entirely without precedent, shall be examined presently ; but let us now take for granted that it is so.  This certainly imposes on us some difficulty ; but it only imposes one which has been gotten over in a case very nearly similar. ' It has been already shown from Brook's Abridgment, title Indictment, § 2. that where some of the grand jury were indicted or outlawed of felony, it might be pleaded in abatement of the indictment.  As far as we can find, there is but one instance of such a plea, and that in the reign of Charles I.  Sir William Whithipole's case, reported Cro. Car. 134.; that this was the first instance of such a plea, is manifest from the reporter's expression, that " because this was *the first plea* that had been upon that statute, and would be a precedent in crown matters, the court would advise."  Here then is a plea, the like of which had never been produced before the time of Charles I. and yet its entire disuse and novelty formed no ground for its rejection. Since the days of Charles I. there has been no precedent of any thing like it.  If then that solitary case had not accidentally happened to occur, the same objection of novelty would as strongly apply to that plea, which is unquestionably good, as it can to that which we have offered to the court.  But novelty only imposes on us the necessity of more accurately investigating the principles of law, on which we rely ; if our deductions from them be well founded (and we trust they are) the objection of novelty vanishes.

Along with this objection of novelty may be classed another ;

namely, that supposing the court will interfere in a case like this, we have mistaken our application; and to that was pointed the attorney general's expression, that Dr. Dodd's case is no precedent for a plea in abatement. To that we answer, 1st. That there may be more ways than one of applying to rectify the same error; and, 2d. That emphatically the most correct and proper way of applying to rectify this error, is by a plea in abatement. The first position may be illustrated thus: It is laid down in Hawk. Pl. Cr. b. 2. ch. 25. § 16. that any one who is under a prosecution for any crime whatsoever, may, by the common law, before he is indicted, challenge any of the persons returned on the grand jury, as being outlawed for felony, &c. or villeins, or returned at the instance of a prosecutor, or not returned by the proper officer, &c. Here then is a summary mode given to the accused of objecting to grand jurors, either by challenging the array, or challenging the polls, as the case may require; but has he no other mode? Sir William Whithipole's case, Cro. Car. 134.; and Brooke, in the paragraph already cited from him, tells us, that these objections may be pleaded in abatement; and Lord Coke (3 Inst. 34.) says, " the safest way, for the party indicted, is to plead, upon his arraignment, the special matter given unto him by the stat. of 11 Hen. 4. for the overthrow of the indictments, with such averments as are by law required (agreeable to the opinion of lord Brooke, *ubi supra*) and to plead over to the felony, and to require counsel learned for the pleading thereof, which ought to be granted, and also to require a copy of so much of the indictment as shall be necessary for the framing of his plea, which ought also to be granted —and these laws made for indifferency of indictors, ought to be construed favourably; for that the indictment is commonly found in the absence of the party, and yet it is the foundation of all the rest of the proceedings." Here then is a case where an objection to the grand jury may be taken advantage of either by a challenge to the jury, or by a plea in abatement, at the option of the defendant. Farther, cases frequently occur, in which an indictment is quashed, on motion for error on the face of it, which might have been the subject of demurrer, or of arrest of judgment; but was it ever said in any of these cases, that because you have the first remedy, you cannot have the last? On the contrary, summary applications on motion, particularly in criminal cases, are comparatively of modern invention; for the most part introduced for the ease of the defendant, and to save him from the technical nicety of formal pleading; but they were never intended to deprive him of the benefit of such pleading, should he judge fit to resort to it.

Dr. Dodd's case, however, can be considered in no other light than as furnishing a plea in abatement, pleaded *ore tenus ;* he averred, that the indictment was found on illegal evidence, which he set forth, and submitted that he ought not to be compelled to plead the general issue. Have not this allegation and prayer all the substantial requisites of such a plea? But the facts which he averred, being admitted, there was no necessity for putting it into form, and the law arising from them was argued as on a demurrer. Had the facts, however, been disputed, and the law indisputable, what should he have done? The answer to this question leads to the discussion of our second position—that emphatically the most cor-

NEW-YORK,
1806.

The People
v.
Smith.

rect and proper way of applying to rectify this error, is by a plea in abatement. Had the facts been disputed, should they have been ascertained by a war of affidavits submitted to the judges, who are not the competent organs for ascertaining facts? No, *ad quæstiones facti respondeant juratores.* If the facts alleged would afford sufficient ground for quashing an indictment, but their truth be controverted, a jury must decide on their truth; a jury cannot decide on their truth without an issue joined; an issue cannot be joined without out a plea put in; and no plea can be put in but a plea in abatement. It follows, therefore, that wherever the facts are capable of being traversed, the only correct way of bringing them forward, is in the form of a plea tendering an issue—the ancient and strict rules, of which the defendants have not lost the benefit, know no other way of bringing before the court facts that ought to prevent an accused person answering an indictment, than by pleading them, that if denied, their truth may be tried by those who are to try the truth of facts; and if admitted or proved, they may appear upon the record, and bring it to a legal termination. Any other way is an innovation—useful in many cases, frequently an advantage to the accused—but on which he may waive, if he prefer the original mode of pleading.

As to the formal objections which were taken, the counsel for the defendant replied to them; but stated, that the facts contained in their pleas had come to their knowledge so very short a time before the defendants were called upon to plead, that they had no time to re-peruse them; and were obliged to file the original draughts, without even taking copies; that therefore, if the court should think any of the formal objections valid, they would pray for liberty to amend; which they had no doubt it would be ready to grant, under the circumstances of these being criminal cases, in which the defendants should not be entangled by niceties, and of there being no precedent to which the counsel could have had recourse for their guidance.

Mr. Edwards replied: but confined himself entirely to the formal objections, and did not enter into the general question whether such a plea would lie. After he had concluded, the court adjourned till the next day.

*Colden* read a subpœna, directed to James Madison, Esq. whereby he was commanded to appear at the present circuit court, to testify in behalf of the defendant. Also the copy of the subpœna ticket, and read an affidavit in the words following:

*City and County of New-York, ss.* Charles Lindsey, attorney at law, being duly sworn, saith, that on the twenty-eighth day of May last he served on James Madison the writ of subpœna hereunto annexed, and also at the same time delivered to the said James Madison a ticket of subpœna, a true and perfect copy whereof is also hereunto annexed, and this deponent farther saith, that at the time of showing the said writ and of leaving the said ticket, he offered to pay to the said James his reasonable expenses, and tendered to him twenty dollars which the said James would not accept, saying, "that he would not take them now, and that it was unneces-

sary to say any thing about them;" and this deponent farther saith, that the said James made no objection to the quantity or quality of the money so tendered as aforesaid to the said James, and farther this deponent saith not. Dated the 16th day of June, 1806.

CHARLES LINDSEY.

*Sworn the 17th day of June, 1806.*
MATTHIAS B. TALMADGE.

*Colden* stated that he had in his hand subpœnas for the other witnesses who did not attend, with like proof of service on them. That the present application to the court, however, would only relate to Mr. Madison, Mr. Smith, Mr. Wagner, and Mr. Thornton. As to the three last the documents he had to offer, were *mutatis mutandis*, the same as those he had read relative to Mr. Madison; it would therefore be unnecessary to trouble the court with reading them; he should put them on file, and the decision of the court on the documents that had been read he presumed would be allowed should govern in the other cases.

He trusted that the court would not order the trial to proceed until the defendant has had the compulsory process of the court, to bring up the witnesses who have disobeyed the subpœna. And that compulsory process, he presumed, must be an attachment for which, in behalf of the defendant, he now applied. He did not move for this process merely as a means of bringing in the witnesses to answer for their contempt in disobedience of the ordinary summons of the court; but he applied for it, as for that compulsory process which, by the constitution of the United States, every person accused was entitled to in order to bring in his witness to testify on his trial. (Here he read the 8th article of the amendments of the constitution of the United States.) He also read the 6th section of the act of Congress of the 2d May, 1793, by which it is provided, that "Subpœnas for witnesses, who may be required to "attend a circuit court of the United States, in any district hereof, "may run into any other district."

*Colden* also read the 14th section, of the act of 24th September, 1789, which enacts, "that the courts of the United States shall "have power to issue writs of *scire facias, habeas corpus,* and all "other writs not specially provided for by statute, which may be "necessary for the exercise of their respective jurisdictions, and "agreeable to the principles and usages of law." This present application, said he, is sanctioned by the constitution, and the laws of our country. There can be no doubt of the power of the court to award the process, for which we apply, nor can there be any question of the justice or propriety of granting it. I will not suppose that there is any thing in the station of the gentlemen who are the subject of the present application, which exempts them from proceedings to which any other citizen would be liable. The court cannot, and I trust will not, recognize them in their official situations; but hear of them only as of men, who have disobeyed the process of the court, and whose attendance the defendant requires as witnesses. I shall not say more on this subject, because I cannot but persuade myself that the process we pray for will be granted as of course. But we have, in behalf of the defendant, a fur-

NEW-YORK,
1806.

The People
v.
Smith.

ther petition to the court; which is that the process be made returnable at a short day, and that the court adjourn *de die in diem* until it may be served and returned.—The defendant cannot go to trial till his witnesses be brought in, and yet he is very unwilling that there should be any unnecessary postponement. The court cannot be ignorant that the defendant, by being removed from an office which was the support of a numerous family, and for which he had; sacrificed all other business, has suffered, while his guilt is yet not proved, a punishment greater than any it is in the power of the court to inflict. The court must also know that while this prosecution is pending against him, it would be in vain for him to seek any new employment or means of life. The court will readily perceive that humanity, as well as justice, requires that the defendant should have not only the benefit of the testimony of his witnesses, but that he should have that benefit speedily. . It is, therefore, our humble petition to the court, in behalf of our client. that the process to bring in the witnesses may be made returnable at some short day, and that the court adjourn from time to time, till the return be made.

We shall forbear at present to urge any farther arguments in support of the motion now before the court. When we have heard the counsel for the prosecution, we may have more to offer.

*Sanford.* The first question is, whether the application of the counsel for the defendant, for an attachment against the absent witnesses subpœnaed in this cause on behalf of their client, is at this time regular? I contend it is not. We are not bound at this time to discuss the question whether the attachments ought to issue or not. When the proper time for the argument of that question shall arrive, we shall be prepared to meet them on that, as on every other question which may occur in the progress of the prosecution.

The court must have observed that the public prosecutor has, in the first instance, moved to bring on the trial of W. S. Smith; while this motion is depending before the court, nothing can be in order but a motion to postpone the trial; that question must precede the application for an attachment, the object of which is to punish the absent witnesses for a contempt. It may happen, that the parties are prepared to go to trial with the witnesses present; we are prepared on the part of the prosecution, and it does not follow that because persons who may have been regularly summoned as witnesses by the defendant are absent, the trial must be delayed even for a day, and still less until the return of the attachments shall be made.

I forbear to say a word at present on the application for an attachment, as a regular or legal mode of bringing in witnesses to testify. When that point shall come before the court, we shall be ready to meet and discuss it. We object to the motion for an attachment at present, simply on the ground that it is irregularly made at this time; and we shall not advance farther in the argument, until the court shall have decided this point.

As therefore the application is altogether out of order, I trust the court will refuse it, and will order on the trial.

*Colden.* I do not see the difference in point of time as a matter of much importance. Whether the court decide on the one motion or

the other first or last would be of little consequence. If the court order on the trial, then we shall renew our motion, and the court will certainly hear our application, and decide upon it before they allow the trial to proceed.

*P. Edwards* wished to be abmitted to say a word in explanation. This prosecution must be at some time brought to trial, and why not now, after the delay already granted by the court? Certainly the defendant's counsel will not press a further delay, unless they show some good reason and legal ground for what they ask.

They say, that the witnesses subpœnaed by the defendant do not appear. Well, is this a ground of delay? Will they be in a better condition if their witnesses are attached, and brought here to answer for a contempt of the process of this court? No such thing—the attachment they solicit, does not go to them *testificando*, to bring them in to give testimony, but merely to receive punishment for an alleged contempt.

The only motion they can make, is to put off the trial for some sufficient and legal cause; if they make that point, we are prepared to meet them; but surely the court will not put off the cause, in order to wait the return of an attachment, to be issued against Mr. Madison and the other gentlemen, who have been mentioned.

*Hoffman.* If the question is to take this shape, I am ready to meet it; but at present we hope the court will, at any rate, grant us a short delay for the absent witnesses to come in. It is the usual practice of the court, when the witnesses do not appear *instanter*, to postpone the trial for a day or more: this is what I should request, as it is probable that two of the witnesses may reach this city tomorrow. Far be it from me, to postpone this trial to a distant day: my only and sincere wish is, that it may come to issue before this court rises; but we anxiously hope that the court, from motives of justice and constitutional right, will grant us the compulsory process to bring in our witnesses, in the manner already requested. We do not dispute on matter of form; when our witnesses are here, the court will command their testimony, and it is with the court to enforce their attendance; but we shall certainly object to the trial proceeding at this moment.

*Sanford.* Do you mean to postpone the trial, on account of the absence of witnesses? If so, it might be cause of eternal delay.

*Hoffman.* Not so. I understand that two of the witnesses now absent, will be here to-morrow, and mention it as a sufficient reason for a day's postponement. But I do not mean to commit myself on the question, whether we are bound to proceed to trial in the absence of our witnesses, when we can show we have used due diligence. When that question is raised, I shall be willing to meet it, and if the witnesses should now come into court, I would cheerfully and confidently go to trial.

*P Edwards.* The district attorney would repel with disdain, the idea of sheltering himself under forms. No, please your honors, he has with great liberality met the opposite counsel, and I feel myself impressed with its propriety. The objection to the mode of proceeding, on the part of the defendant, is founded in great solidity; but it is not proper, at this stage of the business, to disclose to our antagonists the grounds of our opinions. When the proceedings

NEW-YORK,        take their proper shape, we shall have no objection to indulge them
    1806.        in any proper information; till then they will not be answered on
                 irrelevant matter; at present they ought to confine themselves to a
The People       motion for postponement, if postponement is their object.  When
    v.           that is decided by the court, we will proceed with them to discuss the
  Smith.         motion for an attachment against the secretary of state, and other
                 officers of the executive government of the union.

PATERSON, J. informed the bar, that the court had received a letter from Messrs. Madison, Dearborne and R. Smith, informing that they would not be able to attend.  The letter was in these words:

" *To the Honourable the Judges of the Circuit Court of the District of New-York.*

" We have been summoned to appear, on the 14th day of this month, before a special circuit court of the United States for the district of New-York, to testify on the part of William S. Smith and Samuel G. Ogden, severally, in certain issues of traverse between the United States and the said William S. Smith, and Samuel G. Ogden.  Sensible of all the attention due to the writs of subpœna issued in these cases, it is with regret we have to state to the court, that the president of the United States, taking into view the state of our public affairs, has specially signified to us that our official duties cannot, consistently therewith, be at this juncture dispensed with.  The court, we trust, will be pleased to accept this as a satisfactory explanation of our failure to give the personal attendance required.  And as it must be uncertain whether, at any subsequent period, the absence of heads of departments, at such a distance from the scene of their official duties, may not equally happen to interfere with them, we respectfully submit, whether the object of the parties in this case may not be reconciled with public considerations by a commission issued, with the consent of their counsel and that of the district attorney of the United States, for the purpose of taking, in that mode, our respective testimonies.
                      We have the honor to be
                          With the greatest respect,
                               Your most obedient servants.
                                       JAMES MADISON.
*City of Washington,*  ⎰              H. DEARBORNE.
*8th of July,* 1806."  ⎱              R. SMITH.

The court also mentioned that they also had received a letter from Mr. Jacob Wagner, and one from Mr. William Thornton, which stated that they could not attend.  That the letter from Mr. Wagner covered copies of a correspondence between him and Mr. Colden, by which it appeared that Mr. Wagner had offered to give his deposition in writing, if it could be taken by consent on interrogatories.

*Colden* acknowledged that he had received letters from the above mentioned gentlemen; and said that these letters had been submitted to the counsel concerned for the defendant, who had agreed in opinion, that they could not, consistently with the interest of their client, dispense with the attendance of these witnesses, or consent

to receive their testimony in the way it had been offered. Nor did he think it possible that the court would suffer either the letter, which had been read from Mr. Madison and others, or those referred to by the court, to have any influence in the decision of the question then before them. The letter from the heads of departments, written by order of the president, was an attempt of the executive to interfere with the judiciary, which no doubt the court would indignantly repel.

PATERSON, J. The court mentioned these letters, to show that the gentlemen who had signed them, would not be here upon the subpœnas, and were particularly called forth by what had fallen from one of the defendant's counsel, that two of the witnesses would probably be here to-morrow.

TALMADGE, J. Those letters are not to determine how the court shall act; their decision must be formed upon other ground. They were mentioned, as I conceive, with the view of convincing the counsel that none of the gentlemen who have signed them will be here to-morrow.

PATERSON, J. said that was the idea he meant to express.

*Colden.* Our application to the court for an attachment, the district attorney says is superseded by his motion to bring on the trial. I do not mean to enter on an argument on this point: but let me inform him that he misconceives us in this particular. We apply for the attachments not merely to bring in the witnesses to answer for their contempt, but that they may be brought here to testify. We have no partiality for *this* or *that* process, nor care whether the process the court grants to us be called an attachment or any thing else, so that it be that compulsory process which the constitution and laws give us a right to demand.

*Sanford.* The court will please to dispose of the question as to a day's delay for the witnesses, whose attendance is expected to-morrow; but as to the question of attachment it is altogether different. We have moved to bring on the trial; to defeat this motion, the defendant must show that the absent witnesses are material for his defence in the present cause; and I would ask how can he possibly show this when the gentlemen, whose testimony is required, were all at Washington when the military expedition was set on foot, and preparing at New-York? What possible knowledge of their own could they have of those transactions at the distance of 250 miles? No affidavit in common form, stating the materiality of the witnesses, can be admitted; they must show the special grounds on which their testimony can operate for the defendant; and when this shall be done, the court will judge whether the special matter which may be disclosed constitutes a sufficient reason for postponing the trial.

*P. Edwards* concurred in the position of the district attorney, and required of the defendant to show the special ground for the application, wherein the testimony of the absent gentlemen was material to his defence.

*Colden.* That is not the law, as we have hitherto understood it. If we are obliged to offer an affidavit, we conceive it to be sufficient in the first instance, to declare generally, that the witnesses are material without specifying the particular points to which they are

NEW-YORK,
1806.

The People
v.
Smith.

to testify, and that without them our client cannot safely proceed to trial.

PATERSON, J. You must offer an affidavit, and must show in what respect the witnesses are material. The facts charged in the indictment took place, and are laid in New-York; the witnesses are admitted to have been during that period at Washington. The presumption is, therefore, that they cannot be material, and this presumption must be removed by affidavit.

*Colden,* after a short silence, during which the counsel on both sides had conferred together, addressed the court. The counsel have agreed among themselves that the cause shall go off till to-morrow. To which the counsel for the prosecution having signified their assent, *Colden* then said, the trial being disposed of for the present, I now move on the documents which have been read, that an attachment be issued against Mr. Madison.

*Sanford.* We have by no means waived the priority of our motion that the trial may proceed, by consenting to postpone the cause till to-morrow. When the court shall have decided that, the motion for an attachment is in order, and we shall be ready to argue it; but the court will not permit our first question to be superseded by the deference we have paid to their request.

*Washington Morton* said the counsel for the defendant had no objection to this question also going off till to-morrow, and then arguing them together.

*Colden.* If the court would grant us the attachment to day, it would be a gain of so much time, as the trial is postponed till to-morrow.

TALMADGE, J. The questions of bringing on the trial, and of the attachment, are certainly distinct, but setting the first aside for the moment does not authorize the other to assume its place. You cannot have your motion for the attachment argued before it is determined whether the trial shall now proceed.

*Colden.* It has been agreed to postpone the trial: the district attorney's motion then being disposed of, nothing now interferes with our motion for the attachment.

PATERSON, J. The conversation is extremely desultory, but go on in your own way.

*Colden.* I am now ready to open the argument at large, on the motion for an attachment, if the court will please to hear me. But if we now agree to postpone this argument till to-morrow, as we have the preference now, we trust the court will grant it to us then, and hear us before the motion to bring on the trial is renewed.

PATERSON J. Certainly not.

*Harison.* Then I presume we are to give up the idea of arguing the motion for the attachment at present, as the trial is postponed by accommodation.

TALMADGE, J. The accommodation has been granted, for the purpose of giving time for the arrival of some absent witnesses; this throws the trial off for a day, but it cannot give to the defendant's counsel the privilege of having the second motion argued until the first is determined; the first question still retains its priority.

*P. Edwards.* When the attachment is argued, we shall not take

the ground of privilege for the executive officers of the government. I know the district attorney would disdain to rest himself on such a pretext. We shall require of the defendant to show that they are material witnesses, by affidavit and proof; if they cannot make out this point, their application fails. We have suffered the trial to go off for to-day; perhaps the other motion ought likewise to be suspended, especially if the defendant has not prepared his affidavit on which the motion must be bottomed.

*Emmet.* Have the court decided that the motion for the attachment should not be heard in preference to the question which has been postponed till to-morrow? If they have not, I would ask permission to suggest one circumstance why it should have the precedence. The right of the defendant to compulsory process to bring in his witnesses, is not only guaranteed by the constitution and the laws, but springs from the necessity of the furtherance and due administration of justice in all well regulated governments, and if we can obtain the attachment to day it will certainly expedite the trial.

*P. Edwards*, interrupting, said, the court, he presumed, intended to accommodate the counsel on both sides, with the postponement of both questions till to-morrow.

*Sanford*, understood that the court had already decided on that point, by declaring that the public prosecutor should not lose the precedence of his motion, to bring on the trial by the delay which had been accommodated, and he insisted upon the point of order.

*Emmet*, did not imagine the court had decided against hearing the argument in favour of the motion for an attachment. He understood the trial was not to be brought on *instanter*, but certainly that was not to postpone the right of the defendant, to have his motion allowed.

[At this moment the grand jury came into court, and the foreman informing the court they had found no bills, and the district attorney declaring he had nothing to lay before them; they were discharged for the present.]

*Emmet* consented to the accommodation on the condition that it do not operate to the injury of his client, and proposed to offer an affidavit, proving the absent witnesses to be material on the trial. He hoped it would be understood that the trial was to be put off from day to day, until the witnesses came in.

PATERSON, J. The first motion will have the priority in the decision, but if the counsel agree they may argue the latter proposition first.

*Sanford.* We pray the decision of the court as to the mode of proceeding.

PATERSON, J. I am willing to hear the arguments on both points, and I do not care which is argued first, but I do not mean to decide either until both are gone through.

TALMADGE, J. The first motion will have the first decision.

PATERSON, J. You make all the difficulty out of a mere matter of form. If you argue the motion for an attachment to-day, no opinion will be given until the court have decided upon the motion for bringing on the trial. Let them go hand in hand, and the court will take care that neither party shall be caught or entangled in the net of form.

NEW-YORK,
1806.

The People
v.
Smith.

It was then agreed by the counsel on both sides, that the two questions should be argued together to-morrow.

Adjourned, till ten o'clock to-morrow.

*Tuesday, July 15th, 1806.*—Present Judges PATERSON and TALMADGE.

*Colden* made a brief recapitulation of the course of proceedings of yesterday, and then offered the following affidavit of Wm. S. Smith: —viz.

*New-York, ss.* William S. Smith, the defendant in the above cause, being duly sworn, says that James Madison, of the city of Washington, Robert Smith, of the same place, Jacob Wagner, of the same place, and William Thornton, of the same place, are material witnesses for him the deponent, on the trial of this indictment, as this deponent is advised by his counsel, and verily believes to be true, and that he cannot safely proceed to trial of the said indictment without the testimony of the said James Madison, Robert Smith, Jacob Wagner, and William Thornton, and that they have been regularly subpœnaed to attend at this court, on the fourteenth day of July instant, to testify in behalf of this deponent, on the said trial, and have not appeared in the said subpœnas, nor hath either of them appeared : and this deponent farther saith, that he hopes and expects to be able to prove by the testimony of the said witnesses that the expedition and enterprise to which the said indictment relates, was begun, prepared, and set on foot with the knowledge and approbation of the president of the United States, and with the knowledge and approbation of the secretary of state of the United States ; and the deponent farther saith, that he hopes and expects to be able to prove by the testimony of the said witnesses, that if he had any concern in the said expedition and enterprise, it was with the approbation of the president of the United States, and the said secretary of state ; and the deponent farther saith that he is informed and doth verily believe, and hopes, and expects to be able to prove by the testimony of the said witnesses, that the prosecution against him for the said offences, charged in the said indictment, was commenced and prosecuted by order of the president of the United States ; and the deponent farther saith, that he has been informed, and doth verily believe, that the said James Madison and Robert Smith are prevented from attending by the orders or interpositions of the president of the United States—and farther this deponent saith not.

(Signed)                                                W. S. SMITH.

*Colden* proceeded. The present application is to put off the cause on account of the absence of witnesses whose testimony the defendant alleges is material for his defence, and who have disobeyed the ordinary process of the court. In compliance with the intimation from the bench yesterday, the defendant has disclosed, by the affidavit which I have just read, the points to which he expects the witnesses who have been summoned will testify.

If the court cannot, or will not issue compulsory process to bring in the witnesses who are the objects of this application, then the cause will not be postponed.

Or if it appears to the court that the matter disclosed by the affidavit might not be given in evidence if the witnesses were now

here, then we cannot expect that our motion will be successful. For it would be absurd to suppose that the court will postpone the trial on account of the absence of witnesses whom they cannot compel to appear; and of whose voluntary attendance there is too much reason to despair; or on account of the absence of witnesses who, if they were before the court, could not be heard on the trial.

NEW-YORK,
1806

The People
v.
Smith.

It is therefore my business to show that the court can issue compulsory process against those persons who have disregarded the subpœnas. And secondly, that this process ought to issue, because their testimony, as it is disclosed by the affidavit, would be material.

If the witnesses who have been summoned, stand on the same level with their fellow citizens; if there be not something in their high offices to raise them above those laws which are above the rest of the community; then there can be no doubt but that they are subject to that provision of the constitution, which in its terms seems to pay no respect to official dignity or station; but, as it appears to me, gives the accused a right to demand compulsory process against any man whose testimony he may deem necessary to make his innocence appear. I shall not, however, enlarge on the powers of the court in ordinary cases, to issue the process for which we now apply. I shall be content to repose on the articles of the constitution and the laws of the United States to which I referred yesterday.

I proceed to inquire whether Mr. Madison and the other heads of departments have offered a sufficient excuse for their disobedience to the process of the court, by saying they are members of the executive government—whether these dignified sounds elevate them above the constitution and laws.

The general rule is that all persons are bound to give testimony. I have no book from which to read this rule; but I think it is written by the finger of God on the heart of every man. True it is that the necessities of society have introduced one exception, and but one: and that is where a person in the capacity of counsellor or attorney, represents another. This exception is most strictly confined to this relationship. No obligations of secrecy or confidence however sacred; no connections of blood or ties of friendship can interpose in the administration of justice: If they could, a *Russel* would not have perished by the hands of the executioner, or England have been indelibly stained with the blood of a *Sidney*. In the case of the dutchess of Kingston (11 State Trials, 246.) for bigamy, sir Cæsar Hawkins was called to prove that he had delivered the dutchess of a child. He attempted to excuse himself from giving testimony on the ground of professional confidence; but the court wrung from him his secret. And in the same case lord Barrington in vain implored to be excused from giving testimony against the accused, as all he knew had been imparted to him in the confidence of friendship. A Roman Catholic priest has been compelled to disclose the communications of his penitent in his religious capacity of confessor. (2 Atk. 524.)

I do not expect to hear the counsel for the prosecution contend, after this, that any obligations of confidence interpose to shield the defaulting witnesses from the process which in the name of the con-

stitution we demand.   Nor will I suppose that the learned counsel who are opposed to us mean to say that there is any thing in the official dignity with which the witnesses are clothed which saves them from the operation of the laws.   The peers of England have not thought that their titles or stations afforded them any such exemption.   And even the king of that country, who claims his title by divine right, has yielded to the obvious moral obligation of giving his testimony when the administration of justice rendered it necessary. (1 Salk. 278. 2 Hawk. 152. Hob. 213.)   Indeed, if it were necessary to produce authorities on this point, we might go very far back and show that the kings of Judea have witnessed and been witnessed against.   Seld. 1521. 1526. Wilk. edition.

. But it may be said that there are certain political motives which should induce the court to excuse the secretary of state and other heads of departments from giving testimony.   That were they to be examined as witnesses they might disclose state secrets !

If I were to admit that there are certain secrets between the president and his secretaries which they would not wish to disclose, (and I have no doubt there are many such) or which ought not to be disclosed; still the witnesses who have been duly summoned owe obedience to the process of the court; they must appear and be sworn, and when on their oaths, they may avail themselves of this excuse if questions are put to them which they ought not to answer.   But the court must judge and not the witnesses, whether they shall or shall not answer.   Much less shall the witnesses be allowed to determine for themselves whether they will be obedient to a mandate of the judicial authority.   Such was the determination of the supreme court of the United States in the case of Maubry against Madison.   Cranch's Reports, 137.

But the dreadful inconvenience to the gentlemen themselves and the injury to our national affairs, that may result from the court's exercising a power to call on our great men as witnesses, has been suggested.   In the case I have mentioned of Maubry against Madison, Mr. Lincoln took precisely these grounds.   Yet in that case the court would not grant him a moment's time to consider whether he would or would not be sworn, although they had no objection that he should have time to consider what he would or ought to answer.

Before I quit this point I will pray leave to refer the court to one other case which has occurred in our own courts : I mean the case of the United States against Thomas Cooper.   And although I should be sorry to find that case received as law in all its points, because I think there are in it some determinations against the defendant too severe and rigorous ; yet it will show that the question under consideration is not a novel one.   Mr. Cooper calls as witnesses several members of the national legislature and officers of the executive government—Judge Chase permits subpœnas to issue against them—Judge Peters indeed objects to the members of the legislature being subpœnaed, on account of a supposed privilege attached to them as members of the congress then in session, and therefore he thought the process could not be enforced, and that the court ought not to issue a process to which they could not compel obedience.   But an objection on account of official station or

dignity, or on account of executive confidence is not even thought of: Such extraordinary objections are reserved for this very extraordinary prosecution. In the event, Mr. Cooper's witnesses appeared in court and offered to be examined.

If, however, the exemption in the present case should be supposed to extend to the heads of departments, I presume it will not be contended that it extends likewise to Messrs. Thornton and Wagner, who are admitted to be only clerks in the offices. If one clerk is entitled to this privilege, so is every other, on the ground of being an executive agent. Suppose a case of treason or murder: would the court admit of such an apology for refusing to the person indicted compulsory process? It is monstrous to suppose that they would. Why then should it be refused to us in the present case; is the punishment to which the defendant is obnoxious of so trifling a nature, as to render his conviction or acquittal a matter of indifference? No, sirs, the defendant is exposed to punishment extremely severe; he is subjected to a penalty of great amount, and to imprisonment in the common Bridewell, among the vilest felons who are separated from the community. Shall he be exposed to all this, deprived of that shield which will cover him from this ungenerous attack? for the testimony we have sought, and which the court can furnish, will be to us that shield of defence.

Will it be admitted as an excuse, that the gentlemen cannot attend at this time because the affairs of the nation rest upon their shoulders? But it is intimated in their letter, that their official employments will always interfere whenever the defendant may require them as witnesses: in that case we cannot issue an attachment either now or hereafter. Yet it is no uncommon thing to find these gentlemen absenting themselves from the seat of government for months at a time, for their own pleasure or business. It is hard indeed that they cannot devote a few days to the fate of a fellow-citizen.

I humbly hope that I have satisfied the court that they have power to issue the process we pray for, and that no sufficient excuse has been or can be offered for disobeying the subpœnas, and that therefore the attachment ought to be granted; if not for the purpose of bringing in the witnesses to testify, which is now our object, at least I think the court will be of opinion that they ought to compel the witnesses to appear and answer the contempt.

I now proceed to inquire whether the testimony which we expect to obtain from these witnesses may not be given in evidence, when the defendant is on his trial.

And here we may say it may be given in evidence either in mitigation of the punishment, or as a justification. If not as a justification, certainly we shall be allowed to offer it in mitigation; and the proper time to offer it in mitigation is on the trial. There is no doubt but that circumstances in mitigation may be offered to the court after the verdict. If a defendant is so fortunate as to be able to obtain such testimony after he has been pronounced guilty by the jury, the court will undoubtedly listen to it. But the laws do not put it in the power of a defendant to compel a witness to appear and testify in his behalf unless it be on the trial of the issue.

It is as much the right of the accused to lay before the court tes-

NEW-YORK,
1806.

The People
v.
Smith.

timony which may tend to lighten his punishment, as it is to offer testimony that will entirely exculpate him. Is it not as unjust and unreasonable that a defendant should be subject to three years' imprisonment when he can show that he ought not to suffer three days' confinement, as it is that he should be convicted when he is not guilty? If, therefore, there is no other mode of obtaining the mitigatory testimony but by the witness appearing upon the trial, the court will oblige him then to appear. Let us ask, has the law provided any means by which the defendant can compel a witness to give an extra judicial deposition in any criminal case; or is there any process by which the defendant can compel a witness to appear in court after the trial? We answer with confidence, that there is none. Such a thing has never been heard of, and the counsel for the prosecution, we are certain, cannot point out to us any means by which we may oblige a witness to give the testimony we expect, if the court should say they would hear it after the trial. It is true, indeed, where witnesses have voluntarily made affidavits of this nature, the courts have received them after the issue has been decided. But can a matter of this importance to the accused depend on the mere will and pleasure of another? Every notion of justice is opposed to such an idea. And if there be no certain mode of obtaining this testimony but by examination of the witness on the trial, the court will oblige him to appear. We are, however, not without authority on this subject. In the case of the earl of Anglesea, indicted for a misdemeanor, reported in 9 State Trials, 305. it was expressly decided that circumstances in aggravation of the defendant's offence might be given in evidence on the trial. Now if circumstances in aggravation may be offered on the trial of the issue, a fortiori, it must be lawful to give in evidence circumstances of mitigation. For, as it is better that a guilty person should escape punishment rather than that an innocent one should suffer unmeritedly; so it is better that a guilty defendant should escape with too light a punishment rather than that he should suffer more than he deserves. This case of the earl of Anglesea is a very strong one in our favour: the point now before the court was there debated and received a decision which supports the principles for which we now contend. So in many instances have the courts allowed a defendant to give evidence of character, where the character of the defendant could have nothing to do with his guilt or innocence: M'Nally, 320. 323, &c. But we may appeal to universal practice on this subject. Is there a lawyer who hears me that will say he ever knew testimony of this kind refused by a court on a trial? and is it not admitted every day? I hope, therefore, the court will say that although we may only offer this testimony in mitigation; yet the witnesses must be compelled to come here and give us the benefit of it.

We, however, go farther, and offer this testimony not merely as mitigatory, but as relevant to the issue, and as a complete justification of the acts with which the defendant is charged. We say by the affidavit that the witnesses will prove that what the defendant did, he did with the knowledge, consent and approbation of the president of the United States: and if they do prove this the defendant must be acquitted.

Let us suppose that we could prove that the acts charged against

the defendant, were done by the express order of the president of the United States; would not such an order be a complete justification? That the president might have authority to give such an order, cannot be questioned. Congress have the power of declaring war; and when that is done, the president is to act under it, and may authorize any military or hostile measures against the enemy. If it be said that there was no declaration by congress, it is sufficient for us to answer that there might have been. The constitution does not require that a declaration of war should be made public ; it would be absurd to suppose that it did, and that thereby the executive of this country was to be deprived of all chance of taking an enemy by surprise, or of the advantages of secret measures of defence or offence. It is well known, that at the time general Miranda's expedition was set on foot, congress was sitting with closed doors, and might have, nay, it was universally believed that they had, declared war against Spain. If they had done so, the president would have had constitutional authority to sanction the acts for which the defendant is now to answer; and will it be said that the individual acting under the order or sanction of the chief magistrate of the country, who might have had authority to give that sanction, shall be answerable criminally for what he has done pursuant to that order? Must he inquire whether the chief magistrate was or was not authorized to give the order, and must the defendant be punished if it turns out that the president has acted illegally? No; it would be an oppressive and tyrannical doctrine to say the defendant may be charged with a crime under such circumstances. The defendant had only to inquire whether the president gave him an order which might be within the scope and limits of his constitutional functions, and if it was so, the defendant cannot be punished for his obedience. I will not take up the time of the court longer on this part of the subject, or detain it with any argument to show that when we have proved that the defendant acted with the knowledge, consent, and approbation of the president of the United States, it must be equivalent to proving that he acted under an express order.

But let us suppose that the testimony we offer would not make out a justification according to the strict legal acceptation of that term, still we say it would form such an excuse for the defendant as would entitle him to a verdict of acquittal.

If the defendant can satisfy the jury by the testimony of the witnesses whom he now calls, that he had no intention to disobey the laws, but on the contrary that he thought, and had reason to think, that his conduct was sanctioned by their authority; and that he would merit the approbation of his government, and the applause of his countrymen, he will not, he ought not to be convicted.

Where there is no intent to do wrong, there can be no crime. This is a principle not derived to us from tradition or record ; it is in the heart of every man, is imbibed with our reason, and cannot be obliterated while a sense of justice, or knowledge of right and wrong is retained.

I expect to hear it said, that if this principle be applicable to all cases, then an ignorance of the law will always be an excuse for an offence. Sir, I say it will be so whenever a defendant may have

it in his power, clearly to demonstrate that he was ignorant.    As if a law should this day be passed at Washington against the exportation of arms, and a person to-morrow, before he could possibly have knowledge of the existence of such a law, should make a shipment contrary to the prohibition.    I say no jury on earth would convict a defendant under such circumstances.    No court on earth would tell a jury, that in such a case, they ought to convict.    But as it may, in many cases, be impossible to prove on a defendant a knowledge of the law, he is very wisely charged with it.    In the first instance, it is always to be presumed that every citizen is acquainted with the laws of his country, and that presumption must stand against him till it is destroyed by decisive and irrefragable proofs.

And so it is also with respect to the intent.    If an offence is committed against the laws, it is to be presumed that there was an intent to offend until the contrary appear.    But when that does appear, the presumption is destroyed, and the accused is exculpated. The testimony we would offer, may then be heard if only for this purpose, if only to take away that presumption of criminal intent, which the law very wisely and necessarily raises against the defendant.

But whether this testimony may be a justification or excuse, it ought to be submitted to the jury.    They are the judges of the law, and the fact.    And all the facts ought to be brought before them, that they may apply the law.    I do not mean by this that a party is to be at liberty to offer any sort of testimony that he may please, but he has an unquestionable right to submit to the jury every fact that has any relation to the crime with which he is charged.

There is another ground, also, on which the jury ought to be permitted to hear this testimony.    It has become a practice for jurors to recommend a convict to the mercy of the court, where they think he deserves it.    This practice is sanctioned by so many instances, and by such a length of time, that it may now be considered as a right, and if it be so, then certainly the jury ought to have every circumstance before them, which will assist them to determine whether they will recommend or not.

It may be proper, in order that the court may see the full applicability of the testimony we expect from the witnesses who have been subpœnaed, that I should mention the other testimony that we expect to offer in connection with it.    We shall show from the journals of congress, when their secret sessions began, and how long it continued.    We shall prove that it was universally believed that congress had secretly passed an act for going to war with Spain. We shall read the president's message at the opening of the last congress, and a variety of documents communicated by him, on the sixth of December.    And we shall then, from proving the notoriety of the preparations for general Miranda's expedition as well here as at Washington, and by a variety of other circumstantial testimony, bring home to the president the knowledge we impute to him.

Thus, may it please the court, I have endeavoured to establish the power of the court to issue the process for which we ask, and to show that the gentlemen who have been subpœnaed, are not ex-

empt from the process on account of their official dignity, or ex-
cused from obeying the subpœnas, on the ground of their being
confidential executive agents. I have attempted to show that the
testimony which these witnesses would afford us, would be material
either in mitigation or exculpation, and that in either case it must
be given in evidence on the trial. I too plainly perceive how much
I have left undone. But it is my province only to open this argu-
ment.

I am happy that I am to be followed by counsel who will not fail
to supply my omissions.

*Hoffman.*. If I am not precluded by the intimation of the court
yesterday, that it was necessary to disclose, by affidavit, the facts in-
tended to be established by the absent witnesses, I solicit permission
to submit some remarks, tending to show that the general affidavit
ought to be received as sufficient for the postponement of the trial.
With all possible respect, I suggest, that the defendant's counsel
were not heard on this question, and I hope I may consider the inti-
mation not as a fixed or deliberate opinion of the court.

PATERSON, J. You are too late. The question is already de-
cided.

*Hoffman.* I proceed then to add to the opening argument,
and shall limit my observations chiefly to the materiality of the testi-
mony ; for as it respects the right to an attachment, the principles
on which we rely have been fully and ably stated. I, however,
beg leave to read an additional authority, in support of the general
scope of the argument used by my associate counsel.

In 1 M'Nally's Rules of Evidence, 255, it is decided, " that the
claim of exemption from giving evidence, is scrutinized with a jea-
lous eye, and the person relying on it, must establish his right by
showing a positive law, or express authority." The master of the
rolls, Sir Michael Smith, adds, " it was the undoubted legal consti-
tutional right of every subject of the realm, who has a cause depend-
ing, to call upon a fellow subject to testify what he may know of the
matters in issue. And every man is bound to make the discovery,
unless specially exempted and protected by law."

The general proposition, which I shall endeavour to maintain, is,
that the testimony of Mr. Madison and the other witnesses named
in the affidavit, is material to Col. Smith in his defence of the pre-
sent prosecution. It is material, as matter of excuse or justifica-
tion ; but if not strictly as matter of justification, then as evidence to
inform the judgement of the court, in the exercise of its discretion,
in inflicting the punishment. Before I enlarge on these points, I
remark, that it is sufficient for our purpose, to suppose a state of
things between this country and Spain, where the assent and appro-
bation of the executive of the United States, would justify the expe-
dition charged in the indictment ; for if there can be such a case,
the advice of the counsel, as stated in the affidavit, must be pre-
sumed to apply thereto ; unless, therefore, it shall appear *negatively*
to the court, that the prosecution or defence can assume no shape,
where the testimony required will be important, they will not refuse
to postpone the trial. It certainly is not necessary for the defend-
ant to disclose by affidavit, the precise use intended to be made of
the evidence. We are not bound to unfold our entire defence to

the public prosecutor : we are only bound to lay enough before the court, from which the importance of the testimony may be inferred.

The offence charged in the indictment, is, for beginning and setting on foot, preparing and providing the means for a military expedition against a nation, with whom the United States are at peace. And it may be asked, can the United States be in a state of war with a foreign nation, until congress shall have formally declared war ? Congress have alone the constitutional right to *elect* to go to, war ; but in case of an actual war declared or waged by a foreign power, there is no option, war does already exist ; a defensive war, without the agency of congress ; a war *de facto*, and which would take the case out of the statute. Put the case of actual war commenced by Spain, against the United States, when war has not been declared by congress, would it not be permitted to the president, to call out the military forces of the union, to repel the aggression ? Certainly it would. An attack may be made here at the city of New-York ; may not the president commence and execute offensive operations, to draw off the enemy from this port, and put them on their defence in Florida, or any other part of the Spanish dominions ? Offensive war once begun, the nation attacked succeeds to all the rights of legitimate warfare. It may merely resist its enemy, or it may repel its aggressions by a stroke at the head, the heart, or the extremeties. All are equally justifiable.

Suppose, in the progress of this cause, we should be able to verify the language of the president in his message on the subject of a war with Spain, when he speaks of force being to be met by force ; and that we should show the conflict had already commenced, in which we were trying " who could do the other most harm," would not this be actual war ?

I ask, whether a war has not existed between this country and other nations, without a declaration of war by Congress ? Whether it did not exist against Tripoli and other African states, without such declaration ? Do I mistake the fact, when I say, that an expedition was fitted out against Tripoli ? And will it be denied, that we were *then* in a state of actual war ? Yet congress had declared no war. Was the president of the United States justifiable for this act of hostility, commenced without the authority of congress ! Certainly he was. It can never be denied to the executive to resist an attack. He is constitutionally bound to defend the United States against all foreign attacks as well as domestic insurrections, and in the way best calculated in his judgment to insure success. A law was afterwards passed by congress, providing the ways and means of carrying on the war, then existing, and so existing ; and let it be remarked, continuing to exist, without any positive or formal declaration by congress.

If war then can exist between the United States and a foreign nation without a declaration of war by congress, it belongs to the executive of the union to ascertain the fact, and to declare the condition of the nation—to say if actual war exists or not. The constitution delegates to the executive the power to protect and preserve the peace of the United States—to communicate with foreign nations—and he is the constitutional organ through which the people derive their knowledge of our political relations with foreign powers.

Mr. *Hoffman* then urged, that the assent and approbation of the president of the United States to the expedition charged in the indictment, was strong evidence that Spain was not at peace with the United States; as it was not to be presumed, that the president would have violated his trust by authorizing the expedition. At any rate, that he was in the execution of a right constitutionally vested in him—that he alone was responsible; and the individual who acted in conformity to his permission, had committed no offence.

[These topics were again urged by Mr. H. in his address to the jury; the reporter therefore omits to insert them in this part of the trial.]

Mr *Hoffman* then proceeded to the second branch of his argument.

Waiving all farther discussion on the first point, I shall endeavour to fortify the argument, that the defendant is entitled to have the witnesses examined, and to submit his whole case to the court and jury, for the purpose of mitigating the punishment. The constitution of the United States secures to the accused the right to have compulsory process for his witnesses. This privilege is hardly worth the enjoyment, if it is to be confined to the case of a complete acquittal of the charges in an indictment Col. Smith may be technically guilty, and yet his offence of so small a grade, as hardly to merit more than a nominal punishment.

It is conceded, that after the trial, this court has no power to enforce the attendance of the witnesses, and the constitution does not extend its benevolent provisions to my client, unless he is permitted on the trial to prove the extent and nature of his offence.

The correct principle is laid down in M'Nally, already cited, " that wherever the punishment is discretionary, the testimony is to be received, although it only applies for the purposes of mitigation." I think I may, without fear of contradiction, assert that there is no authority to the contrary ; and I speak with confidence that such has been the practice in the courts of this state. While I had the honour of holding the office of attorney-general, the objection was never made ; and I understand, that the practice of my predecessors always corresponded with my own.

Let us examine the question upon the strength of authority. Besides the case already mentioned from M'Nally, there has been read to the court the case of the earl of Anglesea ; to which, I presume, will be opposed the case of the chevalier D'Eon, in 3 Burrows, 1513. The case is shortly thus : An information was filed against the chevalier D'Eon for a libel on the count De Guerchy. M. D'Eon moved to postpone the trial on account of the absence of material witnesses. It appeared that the witnesses resided in France, and were there at the time of printing and publishing the libel, and that they were in the service of the crown of France ; and that there was no probability of their being sent over, or even permitted to come over, to give evidence on behalf of D'Eon.

It is to be observed, that their attendance could never be enforced, nor could they be compelled to give evidence in any stage of the prosecution. Their attendance and their evidence would be

NEW-YORK,
1806.

The People
v.
Smith.

altogether voluntary, and no possible injustice could be done to the defendant by refusing to postpone the trial; for it would be useless to delay it in expectation of obtaining the testimony. Lord Mansfield proceeds to say, " if their knowledge relates to any circumstance that may serve to mitigate the punishment, in case the defendant should be convicted, *that* sort of evidence will not come too late after conviction of the offence, and *may* be laid before the court by affidavits."

Lord Mansfield by no means decides, that the evidence could not be received on the trial: He only says, it will not come too late after conviction.

The chevalier D'Eon was not deprived of any benefit by the course adopted by the court on that occasion, for as they could not aid him by any process that could be awarded, they leave him in the same situation as if the trial was not postponed—*to his ability to obtain voluntary affidavits.* Not so here; this court can enforce the attendance of the witnesses at the trial, and at *no other time.* If the testimony is not then received, the defendant must forego it; for after trial no compulsory process can issue; and, strange as it may seem, the defendant has a right secured to him by the constitution, which he cannot enjoy, if the court refuse to interpose its authority, and compel the attendance of the witnesses at the trial. The case of D'Eon therefore, fairly considered, is in principle with us.

The question appears to be reduced to this single point:—the testimony we seek is material to the defendant in this cause. The court can now give him the benefit of it; if they do not, he may be presented for punishment as an offender whose guilt is of the deepest dye. And is it not material to the cause of the defendant, that the extent of his offence should be known? Is it not material to his personal liberty, to his interest and his character, that the punishment should bear a just proportion to the offence? The discretion granted to the court by the statute is useless, if the defendant is deprived of the means of showing circumstances evincive of his innocent intentions, and justly demanding the utmost lenity of the court.

This subject is before the court in a way extremely inauspicious to the honour of the government of the United States. The president of the United States approving the act which he now seeks to punish—his approbation no doubt proceeded from honourable motives—from enlarged views of the true policy and dignity of our country. It deserved praise. But if he did order this prosecution, it is not for me to justify or excuse the perfidy. Let it, too, be remembered, that in the case of D'Eon, lord Mansfield says, " if the *witnesses* had been sent away by the person on whose account the prosecution is carried on, *that* indeed would have been a sufficient ground for putting off the trial until they could be had. But here, says his lordship, is no pretence for such an insinuation."

Are we not expressly within this principle? The president of the United States ordering the prosecution—and the president of the United States restraining the witnesses from attending.

To conclude—The justice of our present application must be evident, and unless there exists some stubborn and unbending rule of

law to the contrary, I indulge a strong hope, that the court will postpone the trial, compel obedience to its process, and thereby become possessed of the whole truth. If so, my client has no dread of punishment: It may be nominal—it cannot be severe.

PATERSON, J. expressed some regret that it was not in the power of the parties to carry the present motion up to the Supreme Court for its opinion, which could only be done in consequence of a difference in opinion between the two judges sitting in the circuit court, as expressly declared by the law.

Mr. *Sanford* read an affidavit, as follows:—

*District of New-York, to wit.* Nathan Sanford being duly sworn, deposes and says, that the offences laid in the indictments in these causes, took place in the city of New-York between the twenty-fifth day of December last, and the first day of February last; that the facts which will be given in evidence on the part of the prosecution, upon the trial of the said indictments, took place in the state of New-York, and principally in the city of New-York, during that period; that during the whole of that period, James Madison, Robert Smith, Jacob Wagner, and William Thornton, were, as this deponent has been informed and really believes, at the city of Washington, and not in the state of New-York; and that, as this deponent has been informed and really believes, the said James Madison, Robert Smith, Jacob Wagner, and William Thornton, have not, nor has either of them, any personal knowledge of the offences charged in the said indictments, or of the facts which will be given in evidence upon the trial of the same on the part of the United States—and farther this deponent says not.

NATHAN SANFORD.

The People
v.
Smith.

Mr. *Sanford* proceeded to say that the facts stated in this affidavit were not at variance with those stated in the affidavit offered by the defendant.

*Sanford.* If I understand the questions now before the court, they are these:—First, whether the trial shall be postponed until the defendant's witnesses, who are now absent, shall come in—and, second, whether attachments shall issue againt the four witnesses who have not attended upon the subpœnas.

It was decided by the court yesterday, that it was incumbent upon the defendant, in order to entitle himself to a postponement of the trial on account of the absence of these witnesses, to show in what respect they are material for his defence. It was the opinion of the court that the general affidavit in common form would not be sufficient for this purpose; but that the particular facts expected from the witnesses must be disclosed, in order that the court might, upon those facts, judge of the propriety of granting the postponement. In compliance with this decision, the defendant has now made an affidavit, in which he has stated the particular facts which he expects to establish by those witnesses. The matters stated in this affidavit must at present, be taken to be true, and, for the purposes of this motion, it must be supposed that the witnesses are really able to prove the facts stated. The point of inquiry therefore, is whether the matters stated in the affidavit of the defendant, are

NEW-YORK,
1806.

The People
v.
Smith.

material in point of law, to his defence, upon the trial of this indictment.

The principal allegation of the defendant in his affidavit, is, that the military expedition against Carracas, and his agency in it, took place with the knowledge and approbation of the president, and the secretary of state. It is said by his counsel, that this amounts to a complete justification of the offence, or that at least, it must operate in mitigation of punishment; and that in either view, they are entitled to the testimony. This we altogether deny. It can neither operate in justification or in mitigation. The most superficial attention to our constitution and form of government will be sufficient to convince any one that this sort of defence is wholly inadmissible. It proceeds altogether upon the idea that the executive may dispense with the laws at pleasure; a supposition as false in theory as it would be dangerous and destructive to the constitution in practice.

The defendant is indicted for a breach of a positive statute of the United States. Do his counsel seriously contend that the president dispensed with the law in this instance? Where will they find an authority of this nature vested in the president? For unless they show this, they gain nothing by their argument. Among the powers and duties of the president, declared by the constitution, he is expressly required, " to take care that the laws be faithfully executed." They will not venture to contend that this clause gives the president the right of dispensing with the laws. Does the president derive such a power from his legislative character? Certainly not. He has a qualified *veto*, before the law passes. If he approves a bill, he shall sign it; but if not, he shall return it, with his objections, and the bill may be passed into a law, without his consent. When it has become a law, according to the forms of the constitution, it is his duty to take care that it be faithfully executed. He cannot suspend its operation, dispense with its application, or prevent its effect, otherwise than by the exercise of his constitutional power of pardoning, after conviction. If he could do so, he could repeal the law, and would thus invade the province assigned to the legislature, and become paramount to the other branches of the government. To repeal a law, is an exertion of the same legislative power as to make a law; and the legislative power, for whatever purpose exerted, can only be exercised by the whole legislature. The president has no legislative power whatever, except in approving or disapproving bills, which have been adopted by a majority of both houses of congress.

These principles result from the constitution, or rather, they are found in the constitution itself. The constitution of the United States is a delegation of limited powers.—The powers delegated are not only defined with accuracy, but are with equal caution allotted to different branches of the government. We observe throughout the separation of the legislative, executive, and judicial powers, a feature, which renders it justly dear to the people. Hence it has become our boast, that ours is a government of laws, and not of men. The judiciary surely will never give its sanction to so gross a violation of these principles, as would take place if the defence which is now attempted to be made were allowed to prevail.

If, then, the president has no power to dispense with the law, it follows undeniably, that his knowledge and approbation of the offence, cannot be a justification to the offender. If the president has acted improperly, or failed in the execution of his duty, his conduct may be the subject of inquiry before another tribunal. If he has been guilty of crimes or misdemeanors, he is answerable upon an impeachment. The defendant is answerable for his conduct before this court, and a jury of his country.

It is said, however, by the adverse counsel, that if the defendant be not fully justified by the assent of the executive to his offence, yet that circumstance must operate materially to mitigate his punishment. If this idea be analyzed, it will appear to rest upon the fallacy, which, I trust, I have already sufficiently exposed. If the president has no power to dispense with the law, it must follow that an attempt to dispense with it would be altogether a void act, and could not afford any pretence of palliation or mitigation to the offender. But the counsel say that the defendant was, or might have been ignorant of this, and might have supposed that the assent of the executive would shield him from the penalties of the law. This would be to allege ignorance of the law as a defence; and they might as well have urged that the defendant was ignorant of the statute prohibiting military expeditions, upon which he is indicted. Some of the counsel have indeed had the hardihood to assert in terms that ignorance of the law is an excuse. The maxim of law on this subject, undoubtedly is, that *ignorantia juris quod quisque tenetur scire neminem excusat.* This rule must be as much applicable to matters which are urged for the purpose of palliation or extenuation, as to those which are presented by way of justification or complete defence. Were it otherwise, the veriest villain in society might escape from justice, under the pretence that he was ignorant of the law, or that he thought the law was dispensed with in his favour, to enable him to perpetrate offences prohibited to every other person. Our law does not recognize such an absurdity. Every man is bound to know the public laws of the land; and if he violates them, he does it at his peril. Upon these principles, how does the proposed vindication of the defendant appear? The counsel say that he had the countenance or the connivance of the executive in the unlawful expedition. What then? I answer he was bound to know, not only the public statute of the United States, but also that the president has no power to dispense with its provisions. The countenance, or connivance, or consent of the president, can, therefore, neither justify his conduct nor mitigate his punishment. An idea was thrown out by the last counsel, that we were in a state of war with Spain at the time the expedition was prepared, and that therefore the case does not come within the statute, which relates only to military expeditions set on foot against foreign states, with whom the United States are at peace. It would be a sufficient answer to this idea, at present, to say that this is not now a question before the court. The inquiry at present is simply whether the matters stated by colonel Smith in his affidavit, as the testimony which the absent witnesses can give, are material to his defence? It is upon this affidavit alone that the postponement is now asked for. Colonel Smith does not state that he expects to

NEW-YORK,
1806.

The People
v.
Smith.

prove any thing respecting the state of peace or war by the absent witnesses. On the contrary, he states that their testimony will relate entirely to other objects. The affidavit states that the expedition was set on foot with the knowledge and approbation of the president; but contains not a word of a war with Spain. But this is not the only answer which may be given to this idea of war with Spain. It must appear affirmatively on our part at the trial, that the United States and Spain were at peace. How is this to appear? The constitution vests the power of declaring war in the legislature. It is a power given up by the states to the general government as an attribute of the national and supreme authority. It must, therefore, appear from the acts of the legislature, that the country is at war. But, the counsel say that an actual state of war may exist without the declaration of congress, and have attempted to cite instances of such wars.

There is no instance in which the president has undertaken to make war, but in pursuance of the provisions of the constitution and laws passed under it. He certainly has power to repel invasions, and suppress insurrections; but even this is a power not vested in him by the constitution, but is expressly delegated to him by a statute. Act of Feb. 28, 1795.

The counsel also speak of the late war with Tripoli. That war was also authorized by an act of the legislature.

PATERSON, J. desired *Mr. Sanford* to lay that law before the court; accordingly the law in vol. 6. p. 8. was handed up.

*Sanford.* But the question of peace or war, is to be determined by the court upon the laws themselves. The acts of the legislature when they make war, or cause it to be made by others, are like all their other acts; public statutes or general laws which the courts must recognize. So treaties of peace made by the president, with the consent of two-thirds of the senate, are the supreme laws of the land. The judges are bound to know *judicially*, and to conform to these as to all other laws. It follows then, that the question of peace or war, is a question of law, to be determined by the statute book, and not a question of fact, to be determined by the testimony of any man.

The treaty between Spain and the United States, made in 1795, is still in force, and must remain so until it be abrogated by an act of the legislature; and as such is the law of the land while it remains in force, there is no power in this country that can authorize an individual to set on foot a military expedition against Spain, or any of her territories.

In the year 1798, when congress thought proper to enter into a partial war with France, they began by recinding the treaties and conventions which then existed between France and the United States.

The court will not listen to what has been said respecting the president's message to congress at their last session, and the measures which may have been projected or proposed in that body, without having been finally adopted. It is absurd to contend that an individual may infringe the laws at pleasure, because the legislature in their secret deliberations, may have repealed the law or may have declared war.

I do not mean to occupy the attention of the court, in combating arguments or assertions like these. I have attempted to show that the testimony of the absent witnesses is not material either for the purpose of justification or mitigation. The case of D'Eon has been cited on the other side. If that case be examined, it will be seen to be a strong authority in our favor. In that case, the court held that they ought to be satisfied that the witnesses were material; that there had been no neglect in the party applying for delay, in endeavouring to procure their attendance; and that there was a reasonable expectation of his being able to procure their attendance at some future time.

In that case, as in this, it appeared negatively that the witnesses were not material; for they were not present when the criminal transaction was charged to have taken place. It is added, if their knowledge relates to any circumstances, that may serve to mitigate the punishment, in case he should be convicted, that sort of evidence will not come too late after the conviction of the offence, and may be laid before the court by affidavit. Upon the whole, they were clearly of opinion that the putting off the trial could not tend to advance justice, but on the contrary would delay it. This case then is a decisive authority to show that a trial is not to be postponed on account of the absence of witnesses, who, if present, could only give evidence in mitigation of the punishment; such evidence would not be proper on the trial of the issue, and could only be received by the court in its discretion after conviction.

The counsel who opened this argument threw out an idea that because the jury were judges of the law as well as of the fact, they were therefore entitled to hear all the testimony which the party might offer. He attempted indeed to modify his position, but he did not divest it of its absurdity. The court are judges of what is proper evidence to go to a jury; and unless the counsel intend to deny this, and insist that the jury are judges of the testimony which it is proper for them to receive, a position which would be equally contrary to the law and practice, I do not perceive the point of this argument. The court, in the first place, judge of the testimony which is to go to the jury, and the jury then judge of the fact and the law upon that testimony, which the court suffer them to receive.

Having thus reviewed the ideas of others, and stated my own upon the question for a postponement, I now pass on to consider the motion for attachment. The adverse counsel suppose they are entitled to the attachment as of course, and have cited some authorities to prove this point. This we deny. The proceeding by attachment against absent witnesses is undoubtedly known to the law; but such an attachment never issues of course. It is a summary and extraordinary proceeding, which is used by the court in its discretion, to vindicate its justice and punish contempts against its authority. The only rule which can be laid down on the subject, therefore, is, that the court may or may not issue the attachment in its discretion, according to all the circumstances of the case. The party injured by the absence of the witness has his remedy against him by action, without this extraordinary process of the court. When the attachment is issued, it is issued not for the purpose of

NEW-YORK, 1806.

The People
v.
Smith.

bringing in the witness to testify, but in order to punish him for a contempt.

The counsel opposed to us have argued, as if we meant to insist that the absent witnesses are entitled to some peculiar privilege or special exemption from giving testimony. We do not contend for any such exemption; we oppose the application for attachments on other grounds.

If I have succeeded, in any degree, in the preceding part of my argument, I have shown that the testimony of the absent witnesses is altogether immaterial, and could not be received if they were now present. If this be so, it would seem to be a strange absurdity, that the court should be bound of course to issue attachments against persons who are absent, who could not testify if they were present. And unless I deceive myself, it is now presented to the court as a naked question, whether the court shall issue the attachments of course against absent witnesses who have been summoned, merely because they have been summoned, when it appears to the court, from the statement of the party who calls for them, that they could not have testified in the cause if they had attended. If it be discretionary in the court, to grant or refuse the attachments, as we contend it is, this is surely a case in which they ought to be refused. It was an abuse of the process of the court, to summon persons who could not be witnesses. It would be intolerable to subject those persons to imprisonment, not for any purpose of justice, but merely because they were summoned by a process, which issues of course at the pleasure of every party.

I admit that the court have power to issue attachments, but they will undoubtedly exercise it in sound discretion, for fair purposes, and to promote justice. They will take care, on the one hand, to enforce obedience to their process, in all cases where the purposes of justice require it, and, on the other, they will take equal care that this process shall never be turned to improper purposes, or employed to harass men who know nothing of the transaction about which they are summoned to testify.

In addition to this, it appears that the absent witnesses have not failed to attend, from any contumacy or contemptuous disregard of the authority of the court. There are documents before the court, which exhibit the reasons of their absence, and show that they intended no contempt of the court, even if their testimony had been material.

*Colden.* If the letters in the possession of the court which have not been read are alluded to, and are to be made any use of in this argument, I shall pray that they may be read. There are some parts of them which we think material for us, particularly when one of the gentlemen who wrote these letters, says he was present when the president of the United States ordered these prosecutions.

*Sanford.* I will read them.—

PATERSON, J. It is unnecessary. We have the papers before us.

*Sanford.* If the court then are satisfied that no contempt was intended, and that the testimony they could give, were they here, would be immaterial and inadmissible, this surely is not a fit case for attachments. Another objection to the application for attachments arises from the affidavit of the service of the subpœnas. It

is stated that the deponent tendered the sum of twenty dollars to each of the witnesses for his expenses. This sum is insufficient, and the service of the subpœnas being therefore defective, that circumstance alone would exempt the witnesses from being liable to attachment. A witness is not bound to attend, unless the full amount of his expenses is tendered to him at the time of serving the subpœna.

PATERSON, J. Is there any law of congress on that point ?

*Sanford.* Yes, there is a law defining the amount of witnesses' fees.

*Colden.* This does not apply to criminal prosecutions. We contend that it is not necessary to tender any thing to a witness in a criminal case.

PATERSON, J. What! by the common law ?

*Emmet.* Neither by common law nor by statute. The statute of Elizabeth was the first law that gave a witness a right to demand his expenses.

*Sanford.* The whole doctrine is laid down at length in Sellon's Practice, page 454.

PATERSON, J. Is there any statute on this subject by the United States ?

*Sanford.* The compensation allowed to witnesses by the law of the United States is ten cents per mile for going and returning. This, without any allowance for attendance, would amount to more than twenty dollars, in the case of the witnesses from Washington. In respect to the necessity of tendering the expenses at the time of serving the subpœnas, I conceive the law and practice of this state must govern. This must be a case in which the laws of the United States recognize the law of the state as a rule of decision. By the law and practice of this state it is unquestionably necessary to tender the expenses. Here I rest the argument in the hands of the able counsel who will succeed me.

*Colden.* The affidavit states more than the district attorney has attended to. The affidavit is that Mr. Madison found fault neither with the quantity nor quality of the money, adding that it was unnecessary to say any thing more on the subject.

*Edwards.* The vast concourse of people who have constantly attended these trials in every stage of their progress, must convince every intelligent observer, that some motive other than their importance must have produced this effect: From the solicitude discoverable in their countenances, it is evident, an importance has been attached to them which their intrinsic merits do not justify.

But it is improper for me to be more explicit on this delicate point. The learned and independent court before whom I appear, will not participate in that glowing sensibility which evidently warms this assembly; they are above the reach of party views, and will decide with wisdom and the purest integrity. On my part it would be highly indecorous, as well as weak in the extreme, to attempt to influence its decisions on the points submitted, by calling to my aid any consideration which is not intimately connected with such a view of the subject, as must naturally lead to a result demanded by the strict principles of the laws of our country.

NEW-YORK,
1806.

The People
v.
Smith.

Had the present application been made *simply* for attachments against the non-attending witnesses, and *exclusively* for the purpose of *punishing* them for a contempt of the process of the court, the counsel for the United States would not, on this occasion, have troubled the court with any observation. In that case it would have been a matter between the United States and the witnesses: But the motion before the court has a double aspect.

1st. It is a motion for attachments, to the end, that the witnesses named may be brought into court and *punished* for a contempt.

2d. To bring them into court to *testify* in these causes.

And if the motion can be sustained for these two purposes, the effect will necessarily be, that the trials must be postponed.

It will be recollected by the court, that I yesterday stated, that an attachment against a witness for *non-attendance*, after having been duly served with a subpœna, is never granted for the purpose of bringing in the witness *ad testificandum*, but *exclusively* for the purpose of *punishing* him for a contempt. At that time *some* of the learned counsel for the defendant treated this proposition as one wholly untenable: this circumstance led me to hope, that I should, on a discussion of the question now before the court, have heard from them some remarks intended to render my position questionable.

But no observations of the kind which I had anticipated, have been made.

I shall, however, not dismiss that point, until I shall have again stated, and attempted to support by authorities, the position which I then with confidence submitted to the court. I repeat then, that in no case do the courts of common law grant an attachment against a non-attending witness, who has been regularly subpœnaed, for the *purpose* of *bringing* such witness into court *ad testificandum*; but in such case the attachment is issued *exclusively* for the purpose of bringing him into court to answer for the contempt offered to the court, by disobeying its process. In criminal causes, I readily admit, that the practice of granting an attachment against a non-attending witness, subpœnaed on the part of the crown, is very ancient; but my researches have not yet brought to my view a single case, in which an attachment has been granted against a witness, subpœnaed by the defendant in a criminal prosecution.

In point of principle, however, I do not hesitate to say, that it is as competent for the court to grant an attachment in the latter, as in the former case.

But the question still recurs, is an attachment, in either civil or criminal causes, ever granted for the purpose of bringing in a witness *ad testificandum* ?

In the case of Bowles against Johnson, 1 Wm. Blackstone, 36., on motion for attachment against one Yerbury for not giving evidence at the assizes, Lee, chief justice, says, " this is a new case. Attachments are a new practice. I remember the first motion for them." This was in Michaelmas term, 22 Geo. II. 1748.

A recurrence to the English reporters will enable us not only to date the birth of this practice, but to fix upon the very time when the first travail throes took place that eventually brought it into existence. In the case of Hammond v. Stewart, 1 Stra. 510, de-

termined Hil. Term. 8 Geo. I. cited also in Wyatt v. Wingford, 2 Ld. Ray. 1528., and in the case of Daleson v. Aland, determined in the exchequer, Mich. 10 Geo. I. a rule to show cause had been granted, but in each of those cases, the rule was discharged by the court

In Wakefield's case, Cas. Temp. Ld. Harkwicke, 299., determined Trin. 10 Geo. II. in B. R. Ld. Harkwicke says, " the way of proceeding by attachment is a new method."

In the common pleas Trin. 13 Geo. II. in the case of Huffe against Fowke, and in the case of Stephenson against Brookes, reported in Barnes' Notes, 33. the court, in the first case, refused to grant a rule to show cause ; and in the second, after having granted a rule to show cause, discharged the rule and refused to grant an attachment, saying that " the party may have his action upon the stat. of the 5 Eliz. chap. 9."

In the case of Chapman v. Pointon, Easter Term, 14 Geo. II. in B. R. the court say, " that this way of punishing as for a contempt, was new and practiced only in this court ; the common pleas not doing it to this day, but leaving the party to his remedy on 5 Eliz. 6. 9 " 2 Stra. 1150.

From what is said in the case of Stretch and wife against Wheeler, Easter Term, 27 Geo. II. C. P. Barnes, 497. it may fairly be inferred, that at that time the common pleas had not gone into the practice adopted in the King's Bench, long before, of granting attachments for a contempt against non-attending witnesses, who had been regularly subpœnaed.  In the case of Wyatt v. Wingford, the court made the rule absolute for granting an attachment.  This happened 2d July, 1728.

The origin of the practice of granting attachments against witnesses in civil causes having been thus clearly exhibited, I proceed to establish the proposition, that attachments are never granted for any other purpose than that of punishing the witness for a contempt.  Lord Raymond in giving the opinion of the court in the case of Wyatt v. Wingford, says, " But the court in this case thought it was a good foundation for an attachment ; the disobedience to the subpœna being a contempt to the court."  Not a word is said in this case by the court, or the counsel, that intimates an idea that the attachment was moved for in order to bring the witnesses into court to testify.  But there is a circumstance in this case which puts it beyond a doubt, that that could not have been the purpose for which the motion for an attachment was made.  One Rolf Baily had been subpœnaed to attend the assizes in a cause in which Wyatt was plaintiff, and Wingford defendant ; and there had been a tender to Baily of his charges ; Baily did not attend, whereby the plaintiff was nonsuited.  This is the state of the case as reported in 2 Strange, 810. by the name of Wyatt v. Winkeworth, but confessedly the same case as that reported in Lord Raymond, by the name of Wyatt v. Wingford.  Surely after the cause was out of court, the plaintiff having been nonsuited, it must have been idle indeed to have moved for an attachment, if the object aimed at had been to bring in Baily *ad testificandum*.

In the case of Stephenson v. Brooke, before cited, and the case of Brodie v. Tickle, Barnes 35. which latter case was in the com-

NEW-YORK, 1806.

The People v. Smith.

mon pleas, Hill. 24 Geo. 2, were also cases in which a motion for an attachment was made after nonsuit.

To the same purpose is the case of The King v. G. Ring, 8 Term Rep. 585. In this case an attachment was moved for, and granted against Ring for not appearing at the assizes to testify before the grand jury against Everland and Davis, committed, to Salisbury gaol on a charge of felony. Ring not appearing, the grand jury threw out the bill. Jekyll, on the part of the prosecution, moved for an attachment, and it was granted.

The courts of Westminster always consider the proceeding by way of attachment *as for a contempt*, as a *criminal proceeding*.

In the case of Small v. Whitnell, 2 Stra. 1050. the reporter says, " But it appearing not to be a personal service (that is, of the subpœna) the court held it not sufficient to warrant a *proceeding criminally* against him," (that is, the witness.) In this case an attachment was moved for against a witness for not attending, being subpœnaed and having a shilling left. In the case of Chapman v. Pointou, already cited for another purpose, the court say " that this way of punishing as for a contempt was new," &c.

And so strictly is this proceeding by *way of attachment* against a witness as for a contempt, holden, to be a criminal proceeding, that the affidavits and all the other papers in the cause must be entitled, " The King v. the person to be attached."

To this purpose is the case of The King v. The Sheriff of Middlesex, 3 Term, 133. It is there said, " But as the affidavits on both sides were entitled Robins v. Hall, and as the rule was drawn up on the civil side of the court, a doubt arose whether the proceedings were properly entitled, and the court held them to be irregular, and that a motion for an attachment in the course of a civil suit ought to go on the crown side of the court, and the affidavits entitled ' The King against the person to be attached,' because it was not a motion in the cause, but arising out of it."

Farther, it is laid down in all our law books which speak on this subject, the granting an attachment is in the discretion of the court; but if granting an attachment for the non-attendance of a witness be *ex debito justitiæ*, the court can exercise no discretion; they have in that case only the power to inquire whether the witness had been duly subpœnaed, and whether the non-attendance was through obstinacy or not ?—2 Strange, 1150, Chapman v. Pointou.

From this review of the history of attachments, as relative to witnesses, we are authorized to say :

1st. That it never was considered, in the original or progress of this practice, either by counsel or by the court, that an attachment was granted. for the purpose of bringing in the witness *ad testificandum*.

2d. But that an attachment, if granted, was always granted exclusively for the purpose of punishing the witness for a contempt.

But there is another ground on which this motion for attachments may be successfully resisted.

The court will *never* grant an attachment *in the first instance*.

The first motion must be for a rule to show cause.

This was the course pursued in the cases of Hammond v. Stewart, 8 Geo. 1. B. R, 1 Stra. 510. Daleson and Aland, 10 Geo. 1. in

NEW-YORK,
1806.

The People
v.
Smith.

the exchequer. Stephenson v. Brooke, 13 and 14 G. 2. Chapman v. Pointou. Wyatt v. Wingford, 2 G. 2. B. R. Stretch and Wife v. Wheeler, Barnes, 497. 27 G. 2. I mention only the earliest cases.

The case of Chaunt v. Smarl, 1 Bosanquet and Puller, 477. in the common pleas, sets this point at rest. Here the court say, " That in future the practice of this court should be conformable to that of the King's Bench, and the rule should be to show cause why the attachment should not issue *in all cases*, except of non-payment of costs on the prothonotary's *allocatur*."

The motion for an attachment in the first instance, is certainly irregular, and therefore the defendant can take nothing by his present motion. But it has been contended by the counsel for the defendant, that this question, viz. " Shall an attachment be granted to bring in a witness *ad testificandum?*" rests in the courts of the United States on the basis of the constitution. For by the 6th article of the amendments of the constitution, it is among other things provided, " That in all criminal prosecutions, the accused shall enjoy the right, &c. to have compulsory process for obtaining witnesses in his favour." That therefore it is the constitutional right of the defendant to have an attachment to bring in his witnesses, and that nothing short of an attachment will be compulsory process according to the true spirit and meaning of this constitutional provision.

The words relied on by the counsel for the defendant are, " To have compulsory process for obtaining witnesses in his favour."

If the meaning of the word " *compulsory*," here used, can be determined, we shall find no difficulty in ascertaining, with perfect precision, the degree of weight which ought to be attached to the argument urged by the defendant's counsel.

Process to compel the attendance of witnesses in criminal and civil causes was a kind of process well known to the people of the United States, long before, and at the time the articles of amendment to the constitution were adopted. They borrow their language, their laws, and of course the technical terms of them, from England.

The only process to compel (in the first instance) the attendance of witnesses in criminal or civil causes, known to the courts of common law in that country, and in this, is a subpœna. No other process is ever issued in England but a *subpœna* even in criminal causes. When the parliament enacted the statute of 7 Wm. 3 cap. 3. part 7. the crown possessed no right to use any other process than a subpœna to compel the attendance of its witnesses. Until the making of that statute, the prisoner could by no process compel the attendance of his witnesses. By that statute it is enacted, " That every person who shall be indicted for high treason, whereby any corruption of blood may be made, shall have the like process of the court where he shall be tried to compel his witnesses to appear for him at such trial, as is usually granted to compel witnesses to appear against him."

In England, then, a subpœna is *compulsory process ;* it is the only compulsory process (unless entering into a recognizance to appear

NEW-YORK,
1806.

The People

Smith.

at the trial be called process) provided for the crown, or the prisoner, by the laws of that country.

The article in the constitution of the United States, relied upon by the defendant's counsel, it is true, has no relative clause in it, as the statute of 7 Wm. 3. has; for that says, " He shall have the like process of the court where he shall be tried to compel his witnesses to appear for him at such trial, as is usually granted to compel witnesses to attend against him.'

This, however, cannot help the argument of the defendant's counsel. The constitution has not told us what that process shall be, but has used the word process in reference to obtaining witnesses. The words compulsory process, are used as being terms, the meaning of which was then well understood. It was to be process which would, according to the legal notions existing in the minds of the framers of the constitution, be adequate to compel the attendance of the witnesses of the accused.

To the present moment the United States cannot use any other process to compel the attendance of witnesses on their behalf in criminal causes, than a subpœna; and no one has ever entertained an idea, but that a subpœna, when used in such cases, is compulsory process, or in other words, a process to compel the attendance of witnesses.

One of two things must have been in the intentions of the people of the United States when they adopt this amendment:

First. That in all criminal prosecutions, the accused should have such compulsory process for obtaining witnesses in his favour as was then known to our laws, and used for such a purpose; or,

Secondly. That a new kind of compulsory process, not hitherto in use in our courts, or known to our laws, for the purpose of compelling the attendance of witnesses in behalf of the accused, should be provided.

If the former was the intention, then clearly the motion for attachment must be denied, for an attachment in our laws is not known as compulsory process for obtaining witnesses, but the process of subpœna is the only process recognized by our law for obtaining witnesses.

If the latter was the intention of the people of the United States, the amendment relied upon has only provided that the accused shall have a right to compulsory process, for obtaining witnesses in his favour of a new kind not hitherto known to our laws. The amendment not having prescribed what that process shall be; not having said that it shall be an attachment, a warrant, a *capias,* or pointed out any of its attributes other than that it is to be " *compulsory,*" they have, therefore, left the kind of process to be designated and prescribed by a law of congress; for courts of law cannot make a new process wholly unknown to the common law, and unauthorized by act of congress, and not prescribed by the constitution. 'So in article 3d, sec. 1st, of the constitution of the United States, it is declared, that " the judicial power of the United States shall be vested in one supreme court, and such inferior courts as the congress may from time to time ordain or establish." But those courts must be created by act of congress before they can exercise any of

the powers conferred on them by that article of the constitution. So in this case, if a process, not known to the existing laws, be directed in order to compel the attendance of the witnesses of the accused, that process must be provided and established by an act of congress.

But the framers of the constitution never contemplated any other compulsory process than that already known to our laws, and con stantly used, viz. a subpœna.

If by the expression in the amendment relied upon, " shall have a right to compulsory process for obtaining witnesses in his favour," the defendant has a right to an attachment, why was it not used in the first instance ? why was a subpœna the first process that he thought proper to use ? There is no intimation in the article relied on, that the accused is first to use some other process than an attachment, but it is absolute, " a right to have *compulsory process*," and if it be the right of the accused to have any attachment at all for obtaining his witnesses, he has a right to have it in the onset. But if he had a right to have an attachment in the first instance, *ex debito justitiœ*, why did he not use it ? He has been guilty of laches in not taking out an attachment instead of a subpœna. Had he taken his compulsory process in the first instance, he would on this day have had his witnesses in court. But he neglected to do this, and therefore he cannot now have the trial postponed for the *purpose of taking out his attachment*, that is, " *compulsory process for obtaining witnesses in his favour ;*" which process, according to the construction of the constitution contended for by his counsel, he had an undoubted right to have taken out in the first instance.

But we resist this motion on another ground. The motion is in effect, to postpone the trial of the cause for the reason stated in the affidavit. Before it will be granted, the defendant must satisfy the court that the gentlemen named in it are *material* witnesses; and that he has been guilty of *no laches* or neglect, in omitting to do all that he might have done to procure their attendance. These are principles laid down by the court in the case of The King *v. Le Chevalier D'Eon*, 3 *Bur.* 1513. and are found in good sense.

The affidavit upon which the present motion is found, appears to have been shaped with a view to these principles, for it states " that the defendant expects to be able to prove by Mr. Madison" and others, " that the expedition and enterprize, to which the said indictment relates, was begun, prepared, and set on foot, with the knowledge and approbation of the president of the United States ;" and " that if he had any concern in the said expedition and enterprize, it was with the approbation of the president of the United States, and the said James Madison ;" and " that he expects to be able to prove by the said witnesses, that the prosecution against him for the said offence, charged in the said indictment, was so commenced and prosecuted by order of the president of the United States ;" and " that he has been informed, and doth verily believe, that James Madison and Robert Smith are prevented from attending by the order or interposition of the pesident of the United States."

Their testimony, it is urged, is material in two points of view.

NEW-YORK,
1806.

The People
v.
Smith.

1st. It will show that the United States were not, at the time when the enterprise is alleged to have been set on foot, " at peace with Spain."

2d. Should the court be of opinion that it is not material in that respect, it is material for the purpose of showing to the court the degree of criminality attached to the defendant by any agency which he may have had in beginning or setting on " foot the expedition" alleged, and thereby enabling the court to *proportion* the punishment of the defendant according to the degree of his guilt. That to enable the defendant to obtain the testimony of these witnesses for this purpose, it is necessary that he should now be furnished with compulsory process; for after a verdict of *guilty*, any testimony to this purpose must be laid before the court by affidavit, and the law knows of no process by which a witness can be compelled to make such an affidavit.

In support of the first proposition it is urged, that the testimony expected from these witnesses, will establish this as a fact, that the United States were not, at the time when the alleged offence is supposed to have been committed, *at peace* with Spain; for it will certainly evince that " the expedition and enterprise" referred to, " were begun, prepared and set on foot with the knowledge and approbation of the president," and this " approbation" necessarily implies, on the part of the president, an acknowledgment that the United States were then at war with Spain, and by the constitution of the United States, the president possesses the power of determining whether the United States were at war or not, in cases where any aggressions and acts of hostility have been committed by a foreign nation upon the territory, or citizens of the United States. If the constitutional principle which is assumed by the defendant's counsel, cannot be maintained, the first ground, viz. the materiality of this testimony in point of justification, must be abandoned.

In support of this proposition, " that by the constitution of the United States, the president possesses the power contended for," much stress has been laid on the 3d section of the 2d article of the constitution. " He," (the president) " shall, from time to time give to the congress, *information* of the *state* of the union." These words, it has been insisted, give to the president the power of *determining* whether the United States *are* or *are not* in a state of war.

This section, if susceptible of the construction contended for, must also, of necessity, give to the president the power of *determining* after war shall have been declared by congress, that the United States are at *peace*; and of course of repealing the act of congress by which war may have been declared.

The words are, "give to the congress *information* of the " *state* of the union."

In the 8th section of the 1st article of the constitution, it is declared, that " the congress shall have power to declare war." Here this power is given in a most explicit manner. But, if the construction of the 3d section of the 2d article be as contended for, then the constitution in point of effect, reads thus : " congress shall have power to declare war, but the president shall have power to determine when the United States are at war, and when they

are at peace," " notwithstanding congress shall have declared that the United States are at war."

And I ask the learned counsel what will prevent the president from putting an end to a war declared by congress the very next moment after it shall have been declared by them, provided it be true that by stating to congress that the United States are not at war, he can change the state of the country from that of war to that of peace? Was it ever until the present pressing occasion imagined that by making it the duty of an agent to give information to his principal of his *business*, that thereby the agent was vested with the power of altering the condition of the principal?

It is undoubtedly made the duty of all the envoys of the United States in Europe, " from time to time, to give information of the state" of our affairs with the respective powers, at whose courts they represent the United States; but was it ever imagined that those envoys thereby became invested with a power to alter the state of our political relations? The president is obliged by the constitution to give to the congress information of the state of the union; a power to give to the congress *information* of the *state* of the union, 'and a power to declare to congress, what is our political relations as to other nations in point of war or peace, are very distinct powers. The one regards the statement of facts, affecting the United States, which have occurred and come to the knowledge of the president; the other regards the power of determining what shall be the legal effect of those facts, as to the political state of the nation, and its relation to other nations.

The framers of the constitution of the United States appear to have perfectly well understood and duly appreciated the principles expressed by Vattel, in Book III. ch. 1. sec. 4. " As nature has given to men the right of using force, only when it becomes necessary for their defence and the preservation of their rights, the inference is manifest, that since the establishment of political societies, a right so dangerous in its exercise no longer remains with private persons, except in those kinds of rencounters, where society cannot protect or defend them." For in the congress of the United States *solely* and *exclusively* did they place the power of *making war*. As it is the people who are to endure the fatigues and calamities, and sustain the waste of blood and treasure inseparable from war, they have confided the power of making it to their immediate representatives. They have, therefore, declared that " the congress shall have power to *declare war*, grant letters of marque and reprisal, and make rules concerning captures on land and water."

But the wise men who framed the constitution did not stop here; lest the right of making war should be claimed by the several states, they cautiously inserted in the constitution a prohibitory .clause; they declared that " no state shall without the consent of congress lay any duty of tonnage, &c. or *engage in war*, unless *actually invaded*, or in such *imminent danger* as will not *admit of delay*." By the constitution, therefore, no state can engage in war; unless for the purpose of self-defence, and then *only* when *actually* invaded, or in such *imminent danger* as will *not admit of delay*." But if the proposition contended for by the defendant's counsel be

NEW-YORK,
1806.

The People
v.
Smith.

correct, then it follows that although the people of the United States have conferred on congress the power of declaring war, and have denied the power of engaging in war in any event whatever, but those specified in the 8th sect. of the 3d art. of the constitution, to every state in the union; yet that they have, by declaring that the president " shall, from time to time, give to the congress *information* of the state of the union," by necessary implication, given to him also the power of declaring that the United States are in a state of war, or, in other words, of declaring war. That is to say, because it was the duty of the president to give *information* to the congress, that some Spanish troops had come into the territory of the United States, and in a hostile manner carried off the Kempers, and the president, in fulfilment of his duty, had given to congress information of those facts; therefore, the president did declare the United States to be at war with Spain.

To give such a course of reasoning the semblance of solidity, the gentlemen, to be consistent with themselves, must go farther; for the words relied upon are imperative. " He shall," &c. If, then, by giving to the congress information that acts of hostility have been committed against the United States by Spain (and this it was his duty to do,) he necessarily declared war, it follows, that the constitution has imposed upon the president the duty of declaring war in all cases, when acts of hostility have been committed upon the territory or citizens of the United States. If giving information of the state of the union, means stating to congress what is the existing political state of the United States as to war, then it follows that he possesses the power of determining that our treaty with the sovereign of any nation with which we may be thus declared to be at war, is at an end; for if the United States are at war, such treaty is no longer obligatory.

If, however, I should yield to the gentlemen this strange, and until this argument, unheard-of interpretation of the constitution, will it profit the defendant? Has the president given to congress information of the United States being in a state of war with Spain? Has he announced that our relation to that country has become that of war? I ask, what has he done? Why, it is alleged that he has approved of this expedition, therefore the United States are at war! To those who are capable of being misled by such reasoning, any observations within the compass of my abilities to urge, would be urged in vain.

But it has been asked, what if Spain should declare war against the United States, are not the United States *de facto* at war with Spain? Would the United States, in such an event, be at peace with Spain? I answer, whenever such a case shall happen, it may then be proper to consider whether the United States are *de facto* at war with Spain; it is sufficient for us at present, to say, that no such case had happened when the offence charged in the indictment was committed. But should it be granted, that in such a case the United States must be considered as being at war with Spain; that state of war would be produced by the declaration of war on the part of Spain, and not by the act of the president in giving information to congress of the existence of that fact.

But the principle contended for is as novel as it is strange.

NEW-YORK,
1806.

The People
v.
Smith.

If we turn our attention to the practical interpretation of our constitution given by congress under the two former administrations, we shall find nothing to countenance the construction contended for, but much to convince us that it is wholly untenable. On the 27th of March, 1794, congress passed an act entitled an act to provide a naval armament. The preamble is in these words: "Whereas the depredations committed by the Algerine corsairs on the commerce of the United States, render it necessary that a naval force should be provided for its protection." 3d vol. L. U. S. 24. It is here admitted by congress that such depredations had been committed by the Algerine corsairs, as render it necessary that a naval force should be provided for the protection of its commerce. And in sec. 9. of the same act, it is enacted " that if *peace* shall take place between the United States and the regency of Algiers, that no farther proceedings be had under this act." President Washington had given to congress information of the state of the union in relation to depredations committed by the Algerines, but it was not considered that his having given this information, *de facto* placed the United States in a state of war with those barbarians; but congress, this notwithstanding, not only declare that such have been the depredations committed by the Algerines, but in the 9th sec. declare that the United States are *not at peace* with the regency of Algiers. On the first of July, 1797, a time when our affairs with France wore an aspect very much like war, her cruisers and national ships having committed most unjustifiable depredations on our commerce, congress passed another act entitled an " act to provide a naval armament," and by the 12th sec. authorized the president to increase the strength of the revenue cutters, and to cause them to be employed in defending the sea-coast of the United States, and to repel any hostility to their vessels committed within their jurisdiction.

It is in the recollection of the court that outrages on the part of France, unparalleled by any thing yet done by them towards the United States, had been offered. These were stated by the president in a most explicit manner; a special congress convened for the purpose of taking these outrages into consideration. But this congress did not deem it their duty to declare that those outrages amounted to war. The president did not imagine that he possessed the power to produce that state of things called war; and congress did nothing more than to provide for the defence of the commerce of the United States, *within its jurisdiction.* The discontents between this country and France still wearing the appearance of an approaching war, on the 28th May, 1798, it was enacted by congress " that the president of the United States be authorized, in the event of a declaration of war against the United States, or of actual invasion of their territory by a foreign power, or of imminent danger of such an invasion discovered in his opinion to exist, before the next session of congress," to cause to be enlisted, &c. From this it is manifest that even at this time congress does not admit that we were at war with any foreign power. On the same day congress passed an act entitled " an act more effectually to protect the commerce of the United States;" the preamble to which is in the words following, viz. " Whereas armed vessels sailing under au-

thority, or pretence of authority, from the Republic of France· have committed *depredations* on the commerce of the United States, and have recently *captured the vessels and property of citizens· thereof, on and near the coasts, in violation of the law of nations, and treaties between the U. S. and the French nation,* therefore," &c. Here is an admission by congress, that *armed vessels* sailing *under authority,* or pretence of authority, *from the Republic of France,* had committed depredations on our commerce, and captured our vessels in or near our coast, *in violation of the laws of nations and of treaties* between the U. S. and the French nation. But what did they do?—" Authorize the president to instruct and direct the commanders of the armed vessels belonging to the U. S. to take, seize, and bring into any part of the U. S. to be proceeded against according to the laws of nations, any such armed vessel which shall *have committed,* or which shall be found *hovering on the coasts* of the U. S. for the purpose of *committing depredations* on vessels belonging to the citizens thereof; and also to retake any ship or vessel of any citizen of the U. S. which may have been captured by any such armed vessel." 4th vol. 120. Defence only is what they authorized; but congress did not even then declare that we were in a state of war.. Sixteen days after this, congress passed another' act, entitled "An act to suspend the commercial intercourses between the U. S. and France, and the dependencies thereof." 4th vol. 129. This act is what its title bespeaks it to be. By its 5th sect. it is provided "That if before the next session of congress, the government of France, and all persons acting by or under their authority, shall clearly disavow, and shall be found to refrain from the *aggressions, depredations, and hostilities, which have been, and are by them 'encouraged and maintained against the vessels* and other property of the citizens of the U. S. and against their national rights and·sovereignty, *in violation of the faith of treaties and the laws of. nations,* and shall thereby," &c. Congress in this section have put it on record, that the government of France had been hostile, and at the time of making this act, were committing *depredations* upon the vessels and other property of the citizens of· the U. S. and *against their national rights and sovereignty, in violation of the faith of treaties and the laws of· nations,* but still congress does not declare war, nor admit that the U. S. are in a state of war.

On the 22d *January,* 1798, an act was passed authorizing the president to increase the strength of the revenue cutters, "for the purpose of defence against hoitilities *near the sea-coast* ;" and on the 25th of the same month, congress passed an act authorizing "·the commanders and crews of any merchant vessel owned wholly by a ·citizen thereof, to oppose and defend against searches and restraints by the commanders and crews of any armed vessel sailing under French colours, and to repel force by force." 4th vol. 148. Here again is a congressional declaration, that/" *lawless depredations and 'outrages,*" had been "hitherto encouraged and authorized·by the government of France," that that government had not caused *the laws of nations to be observed* by armed French vessels;" but no declaration of war, or admission of its existence.

On the 7th *July,* 1798, an act passed entitled "An act to declare the treaties heretofore concluded with France, no longer obligatory

on the United States." On the 9th of that month " An act farther to protect the commerce of the United States," was passed, giving to the president the power of " instructing the commanders of the public armed vessels employed in the service of the U. S. to subdue, seize and take any armed French vessels," "and providing for their condemnation and other purposes." In addition to those, other acts were passed, to some of which I shall refer. 4 vol. L. U. S. 264. 271.

But I will now close my remarks upon acts of congress, by reading the first section of an act passed the 2d of *March*, 1799, entitled "An act giving eventual authority to the president of the U. S. to augment the army," &c. 4 vol. 489, by which it is enacted " That it shall be lawful for the president of the U. S. in case *war should break out* between the U. S. and a foreign European power, or in case imminent danger of invasion of their territory by any such power shall. in his opinion, be discovered to exist," &c. Here we have a declaration made by congress, and by the president of the U. S. that notwithstanding all that had hitherto happened, no war had as yet " broken out between the U. S. and France."

What are the plain obvious inferences which press themselves upon us from all these acts of congress? 1st. That acts of hostility committed by a foreign power against the U. S. or their citizens do not necessarily place the country in a state of war. 2. That acts of hostilities, though " outrageous, in violation of the laws of nations, and in contravention of existing treaties," had been committed upon the U. S. by a foreign nation, yet presidents Washington and Adams never entertained an opinion, that by declaring to congress the existence of these facts, they thereby placed this country in a state of war. 3. That congress have always considered the power of declaring war to be invested exclusively in them. 4. And that such has always been the understanding of the nation.

But a principle still more dangerous has been advocated. "That whether the U. S. be at war or at peace, is a question of fact to be determined by the jury, from facts which may be proved to exist in *pais* independent of any act of congress." That is, that a jury of twelve men are the proper constitutional judges to decide whether our nation is at war or at peace, though congress shall not have declared war, though the president shall not have said that we are in a state of war, and though war may not have been declared against us.

To all this, I answer, in a few words, that to very little purpose indeed have we cautiously and expressly confided by our constitution, to the representatives of the nation, the power of declaring war, if the peace of the nation may be compromitted by a jury, however honest and well intentioned.

Wretched, supremely wretched, is the condition of the people of the U. S. if such a power be in the hands of every jury which may be empannelled to try a criminal. All other civilized nations have intrusted that power to the sovereign of the state ; but here a jury of twelve men, whether congress has declared it or not, whether the president has announced it or not, is competent to place upon the records of our courts, that we are at war. To say to Spain,

NEW-YORK,
1806.

The People
v.
Smith.

"the United States are at war with you." What will not Spain be justified in doing, if this be a constitutional mode of settling the question, and a jury by their verdict shall say the U. S. are at war? May she not say and act accordingly : " your nation is at war with ours ; this has been declared, as appears by the records of your country, by its constituted authorities. We, therefore, will capture your vessels, enslave your citizens, bombard and sack your towns, and slaughter your inhabitants." Thus she will have a right to say to us, and thus may she lawfully treat us.

Nor can the admission of this testimony be sustained on the second ground. What have the jury to do with the question,— "what is the degree of the defendant's criminalty ?" They are to determine whether he is guilty of the crime charged, but they are not to decide whether there are any mitigating circumstance which ought to lessen the punishment. The court exclusively must settle this question. The authorities cited by the counsel for the defendant do not at all support the admission of the ground which is here contended.

In the case of the King v. Lord Anglesea, the court permitted the counsel for the crown to go into evidence calculated to show that Lord Anglesea sought after an opportunity, and persisted in the pursuit of the purpose eventually accomplished ; and it certainly was very proper, when attempting to show the nature of the crime charged upon the prisoner, to adopt such a course of proceeding, when the precise nature of the crime committed could not otherwise be ascertained to the jury.

The cases from 1 M'Nally, 320, 321, 322, 323, by no means favour the gentlemen opposed to me. They only establish this rational principle, *that the prisoner may call witnesses to his good character, and that the witnesses so called, may, in such cases, relate particular facts within their knowledge, which have induced the good opinion entertained by them.* Thus Lord Kenyon expressed himself in the case of the King v. Thelwal, at a special commission of *oyer and terminer,* in 1793, at the Old Baily, as follows : " An affectionate and warm evidence of the character, when collected together, should make a strong impression in favour of the prisoner, and when those who give such character in evidence are entitled to credit, their testimony should have great weight with the jury ;" and such evidence is in the very nature of things relevant. If the character of the prisoner has always been fair, it is certainly less probable that he should have committed the crime charged, than if his character had been notoriously bad. As to the solitary remark of Judge Down, in the case of the King v. Mockler, it stands alone, unsupported by any authority, or even the dictum of a single advocate or elementary writer.

The testimony offered, then, if there is any weight in this reasoning, is wholly irrelevant. If Mr. Madison and the other witnesses were now here, and sworn in this cause, they would not be permitted to give in evidence to the jury, any of the facts alleged in Col. Smith's affidavit ; because they would not tend to show that the defendant was not guilty. The president of the U. S. possesses no power to dispense with the laws, but, on the other hand, is bound by his official oath to preserve them inviolate, and to defend the constitution of the U. States.

But it is incumbent on the defendant to show that he has been guilty of no laches or neglect in his endeavours to procure the attendance of the witnesses. Has the defendant done his duty in this particular? He has served subpœnas on his witnesses, he has tendered to them twenty dollars. The distance from the city of Washington to this place is 240 miles. By the 6th sect. of the act, passed 28th *February*, 1799, it is enacted " that the compensation to jurors and witnesses, in the courts of the United States, shall be as follows : to wit, to each grand and other juror, for each day he shall attend in court, one dollar and twenty-five cents ; and for travelling expenses, at the rate of five cents per mile from their respective places of abode to the place where the court is holden, and the like allowance for returning "

This compensation, we contend, the witnesses were entitled to receive before they started from Washington. The law imposes no obligation upon a witness to give a credit to the defendant. A witness, by the subpœna, is called upon to leave his business, to travel to the place of holding the court, and to remain there until the cause is decided or he is dismissed. But is the witness compellable to do this until he receives his compensation? The words are " the compensation to witnesses in the courts of the U. S. shall be," &c. In England, since the statute of 5 Elizabeth, ch. 9. no witness, until his reasonable expenses are tendered to him, is bound to appear at all ; nor, if he appears, is he bound to give evidence till such charges are actually paid. 3 Blk. Com. 369. Congress, however, has not left this question, " what are reasonable expenses?" open for discussion, but has declared that five cents a mile for going to, and the same for returning from court, shall be the compensation to which he shall be entitled. But if the witnesses are holden by law to attend without this compensation being first paid, how are they ever to obtain it? How, but by suit? And if the witness, through poverty, is unable to attend, is he notwithstanding to be adjudged guilty of a contempt?

The question as to the construction of the statute of 5 *Eliz.* ch. 9. in this regard, came before the court of Common Pleas, in the case of Fuller v. Prentice, 1 H. Blk. 49, on a motion for an attachment. But the court refused the attachment, saying, " that it might afford a dangerous precedent, by which witnesses coming from their places of abode to attend at trials, might be deprived of the re-payment of their necessary expenses ; the whole of which, as well of their going to the place of trial, as of their return from it, and also during their necessary stay there, ought to be tendered to them at the time of serving the subpœna, otherwise an attachment would not lie." And yet in that case, 2s. 6d. had been given to the witness, and a promise made to bear all her expenses, and a place was taken for her in the stage, and she had promised that she would go, but when the stage called she refused to go, and confined herself in her house.

The statute of Eliz. is substantially the same as the act of congress. By the former it is enacted " that if any person upon whom process shall be served to testify or depose, and having tendered to him such reasonable sum of money for his or their costs and charges." Suppose the words in that act had been, " tender-

ed and paid to him ten cents per mile for his costs and charges," &c. would not that statute, if thus expressed, have, in effect, declared that ten cents per mile should be the compensation to the witnesses? What are the words of the act of congress? "The compensation to jurors and witnesses in the courts of the United States, shall be," &c. Compensation necessarily implies satisfaction or payment for something done, or to be done by the witnesses. Before the statute of Eliz no law existed by which witnesses could insist on payment of their reasonable costs and charges. Congress by this act have provided that they shall be compensated for their costs and charges, and, to put to sleep all controversy about what should be considered as reasonable costs and charges, have said, it shall be ten cents per mile, &c. The right of a witness to compensation, and the amount of compensation are both settled by the act of congress, and by necessary implication. The duty of the party who serves process on the witness, is also settled, for the act says what the compensation shall be, but it is no compensation if it is not paid. Was it not, therefore, the duty of the person in whose behalf the witness was served with process, to have tendered or paid the ten cents per mile, if he intended, in case the witness did not appear, to proceed against him for a contempt? But the compensation has not been paid or tendered to the witnesses, nor does the affidavit of the person who served the subpœna help the gentlemen over this difficulty. He says that he offered Mr. Madison more, but that he observed that it would be to no purpose. In the case of Fuller v. Prentice, 2s. 6d was tendered to the witness, a promise was made to bear her expenses, a place was taken for her in the stage-coach, she promised to go, and *more money* was offered, and yet an attachment was refused. On no principle, therefore, can an attachment be issued against Mr. Madison.

An attachment for the purpose of bringing in a witness *ad testificandum*, is never granted.

The article of amendment to the constitution has instituted no new compulsory process.

The testimony which the witnesses named could give, if present, as stated in the defendant's affidavit, is wholly irrelevant, and the motion for an attachment is premature.

*Wednesday, July* 16, 1806.

Some desultory conversation arose at the bar, when the argument proceeded :—

*Emmet.* The counsel for the prosecution, who last addressed the court, adverted to the interest and anxiety which, from the number and respectability of the audience, it is manifest that this cause has excited in the public mind; and he was pleased to intimate that he had it in his power to assign a motive for this general solicitude, totally different from the actual importance of the prosecution.—To me, I confess, it appears, that the novelty and nature of the questions heretofore agitated, and those likely hereafter to arise in the course of these trials, are fully sufficient to fix the public attention upon the proceedings of this court. You are making precedents in criminal jurisprudence, the influence of which may hereafter be very great and extensive; and you are doing so under

the judiciary system of the United States, where precedents of that nature are by no means common. Besides the enterprize, with which the defendant is supposed to be connected, is in itself calculated to awaken in his favor the most general sympathy and interest. It was therefore hardly worth the learned counsel's while to hint, with some appearance of severity and cen ure, at any extrinsic inducements for the portion of attention. that the public may bestow upon our proceedings But if in doing so, and if by the motive which he did not think proper to assign or specify, he intended to allude to any thing in the conduct of the defendant's counsel, as one of them, standing in a very extraordinary and delicate situation, I intreat the indulgence of the court, while I say a few words about myself.

Attached as I am by the strongest connection to those principles, which placed the present administration in power; feeling for the members who compose it the sincerest esteem; and wishing to see them exalted on the highest pinnacle of respect, it will be with extreme reluctance and personal pain, that I shall, perhaps, in the course of these proceedings, press inferences or facts, somewhat derogatory to that dignified and honourable reputation, which they have most deservedly acquired. In the present cause, however, no sentiment of private respect or public feeling can be permitted to interfere with the discharge of my professional duty. Colonel Smith has done me the honour of thinking that my exertions may be useful to him in the conduct of his defence; and surely there is nothing in the character of that gentleman, nor even in the fact with which he is charged, that could justify my withholding those exertions; more especially, since (if those things which he has stated to me in private, and sworn to in court, shall be proved on his trial) I cannot but consider him as "a man more sinned against than sinning." The learned counsel, however, may rest assured, that although I shall earnestly urge whatever I conceive pertinent and necessary to my client's defence, I shall not be induced by any wish of exalting my own character, or acquiring the favour of any party or description of men, to wound the feelings of those whom I respect, or to urge what may be unpleasant to them, farther than is indispensably necessary. I have no wish through this trial to excite unfavourable impressions against any one; on the contrary, most gladly would I erase all memorials of it from the records of this court, and blot out from the public mind all remembrance of it, and of the transactions to which it has given rise. What irresistible motives caused it to be commenced, I cannot presume to divine; but it is the only error that I feel inclined to impute to the administration; for as to the part they took, according to my client's statement, in the enterprize, for assisting which he stands indicted, I trust, before I conclude, I shall evince myself to be not only the defender of Col. Smith, but of the government itself. The court will pardon my having spoken thus much of myself; but I conceived this explanation due to the peculiarity of my situation, and to the extent of my obligations to those whose friendship has contributed to place me in a situation so peculiar. I shall now proceed to the matter before the court.

The affidavits, on which these motions must be decided, are, I

NEW-YORK, 1806.

The People v. Smith.

apprehend, perfectly consistent with each other. Col. Smith considers the gentlemen at Washington as material witnesses for his defence, and assigns his reasons for that opinion, by specifying the facts which he expects to prove from their testimony. These reasons are not removed by Mr. Sanford's affidavit, which does not controvert or doubt any of the facts specified ; but merely says, in general terms, that he does not conceive the witnesses to be material. I trust I shall be able, when we shall have come to the discussion of that question, to convince the court of their materiality. I propose, with its permission, to argue first, the motion for the attachment, and secondly, that for putting off the trial.

The counsel for the prosecution have displayed very considerable learning and research in tracing the history and progress of attachments against witnesses in England ; but they will allow me to say, that their learning and research have no application to the law on that subject, as it exists in America. The counsel who spoke last, professed to detail what he called the " travail throes" of the measure ; but as far as relates to the judiciary of the United States, it had, in this country, no travail throes ; it is derived from the constitution, the head of our laws ; and like the celebrated offspring of the head, it was consummate at its birth. We claim the process of attachment to compel the attendance of witnesses, as a matter of right, by virtue of the 6th article in addition to, and amendment of, the constitution (Graydon's Digest xvii. printed as article 8th) which says, that in all criminal prosecutions, the accused shall have *compulsory* process for obtaining witnesses in his favour. By the 14th sec. of the general judiciary act, passed September 24th, 1789 (Grayd. Digest, 243.) which gives to the courts of the United States the power " to issue writs of scire facias, habeas corpus, *and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law ;*" and lastly, by the sixth section of the act of 2d March, 1793. (Grayd. Digest, p. 256.) which provides that " subpœnas for witnesses who may be required to attend a court of the United States in any district thereof, may run into any other district." These provisions form a striking difference between the English and the American law. It may be, as the learned counsel contends, that in England the granting of an attachment is discretionary with the court, which may refuse it, or issue it for the purpose of vindicating its own dignity. In that country the party accused was for a long time wholly unprotected ; he could not examine his witnesses on oath, and had no means for compelling their attendance. It was not before the 7 W. 3. c. 3. that any compulsory process for witness was given to the accused ; that act was expressly confined to cases where the judgment would work corruption of blood ; and that is the only law, even to this day, which gives such process in any criminal case whatever. The 1 Ann. c. 9. enacts that witnesses for the prisoner shall be sworn, and under the equity of that statute, if I may say so, the courts have, in other criminal cases, awarded compulsory process ; but they have considered themselves entitled to exercise their discretion as to granting attachments. I therefore broadly contend, that although in England the subject, when accused, may

not have a right to compulsory process, yet in America the citizen has it secured to him by the highest authorities, the constitution and laws of congress: and I here claim the attachment as the right of my client.

The opposite counsel have endeavoured to entangle us by raising a distinction that we are not entitled to an attachment on a general affidavit. In answer to that objection, it may be observed, that our affidavit is special, and states sufficient to show the importance of the testimony expected from those gentlemen. That topic I shall discuss at large, in arguing the motion for putting off the trial; but, postponing it until then, I shall here insist that we are entitled to have this motion granted, even on a general affidavit, and that it is not necessary to state any thing respecting the nature of the evidence they may give. An attachment is our right: the ordering of it must therefore be as much a matter of course, as the issuing of a subpœna. Were I to apply to the officer of the court for a subpœna, should I be stopped by an inquiry on his part, how far the witness was material? Certainly not: When I come then into this court, and ask for what is equally my right, and ought to be as much a matter of course, shall I be stopped by interrogatories, which it could be necessary to answer, only if I were applying for a writ, that the court might, in its discretion, either grant or refuse? We have shown that the witnesses have disobeyed the process of the court by non-attendance. With regard to them, subpœna is not a compulsory process, and we therefore ask, under the 6th article of the amendments of the constitution, and the 14th section of the judiciary act, for a process that will *compel* their attendance. This process, " agreeably to the principles and usages of law," is an attachment; and an affidavit of the service of the subpœna, with the absence of the witness, without a sufficient excuse, is all that can be requisite for the success of our application.

The counsel on the other side have told us, that we are only entitled to a conditional rule in the first instance. If that should be the opinion of the court, it will only influence the manner of making out the order, and cause us to accept of a rule to show cause; it would make no difference to us, except so far as it might delay our trial; but, from the probability of that delay, arises an irresistible objection to a conditional order, that it would prevent a speedy trial. By the 6th article of the amendments to the constitution already quoted, the accused shall enjoy the right to a speedy trial; for the purpose of which he shall have compulsory process to obtain the attendance of his witnesses. That process, then, ought to be modified, so as to be consistent with, and to procure a speedy trial. Here, also, the authorities from the English law books become inapplicable, if the counsel for the prosecution are right in the position for which they have principally contended; because the granting of the attachment in that country is, as they say, a matter of *discretion;* in America it is a matter of *right;* and surely those authorities that refer only to questions of discretion, can have no bearing on a question of constitutional right. If the process were only issued to vindicate the dignity of the court, it might proceed by slow degrees, and begin with a conditional rule; but there are not the same motives, nor is there the same power to in-

NEW-YORK,
1806.

The People
v.
Smith.

terpose that delay between the right of the accused to a speedy trial, and his right to compel the attendance of his witnesses. That dilatory rule is only authorized, or required, where the matter to be ultimately decided upon rests in the discretion of the court

But it is said that we did not tender to the witnesses the necessary expenses ; that we were five dollars short of the precise sum. Is this Mr. Madison's objection, or will he feel grateful to those who urge it on his behalf ? I presume not, for he has expressly disclaimed it. The tender was twenty dollars in the first instance, and a farther offer to pay all his expenses ; and the affidavit of service states, that on this offer being made, the secretary of state replied, it was unnecessary saying any thing more on that subject; thereby undoubtedly waiving the benefit of an insufficiency in the tender, if under any circumstances advantage could be taken of it.

The truth, however, is that the objection would not avail them even in England. The case cited by the opposite counsel are all in *civil* actions, and the necessity of tendering to witnesses their expenses, at the time of serving the subpœna, was created by the 5 Eliz. cap. 9. sec. 12. which relates only to such suits.—In criminal cases no tender was ever held to be necessary.

PATERSON, J. Is there not good reason for that, when the defendant would not be entitled to any process at all ?

*Emmet.* The observation is certainly correct. The statute was passed when persons accused were in no case entitled to such process ; and it could not be within the purview of the law, to make them tender money on service of a process, to which they were in no respect entitled. In criminal cases it is perfectly settled that witnesses are bound to attend    Hawk. Pleas of the Crown, B. 2  ch. 46. sec. 173. is explicit on this point.—'' It seems that in civil proceedings a witness is not obliged to attend, unless his expenses are tendered to him, pursuant to 5 Eliz. c. 9. and if after such tender he neglect to appear, he may be fined according to the directions of that statute, or punished by attachment for a contempt of the court, as the circumstances of the case shall appear to be.    But in criminal proceedings the demands of public justice, supersede every consideration of private inconvenience ; and witnesses are bound unconditionally, to attend the trial upon which they may be summoned, and be bound over to give their evidence.''

PATERSON, J. You say that the defendant is entitled to compulsory process, as of right.    Is there any statute of the United States, which makes the *tender* of expenses to the witness on the service of the subpœna necessary ? ·

*Emmet.* I apprehend not; and in that respect there is a very manifest difference between the English and the United States' law.    By the statute of Eliz. a *tender* is necessary from the express words of the act ; and those words have regulated the decisions of the English courts.    By the United States' act of the 28th February, 1799, sec. 6. (Grayd. Dig. 260.) a *compensation* to witnesses is regulated, at the rate of 5 cents a mile for travelling, and $1 25 cts. for every · ay's attendance in court.    It struck me on reading that law, that those sums of money were to be paid to witnesses, as to jurors, by the United States, and not by the defendants ; and on inquiring as to the practice, I find that the officers of the court are

not agreed. On this point, therefore, the court must form its own conclusion. But from whatever quarter the compensation should come, jurors and witnesses are by the law put upon the same footing : Would a juror, when summoned, be permitted to say, I will not obey the process of the court because I have no tender of my expenses ? Certainly not. By what construction of the act, then, can that objection lie in the mouth of a witness ?

PATERSON, J. Has there been any decision under this statute on the ground of tender ?

*Emmet.* I answer, perhaps without sufficient information, not—at least, not to my knowledge. But when I couple this law with the article in the amendments to the constitution, which says a witness *must* attend, I think he can claim no right to a previous tender of his expenses ; but must perform the service of attending, and in case of non-payment, he becomes entitled to his action for the compensation.

Another question has been raised ; it has been insinuated rather than explicitly expressed, by one of the counsel for the prosecution, that those witnesses could not be coerced to appear. If hereby is meant to be asserted any peculiar privilege of office, certainly such claim cannot be made by Doctor Thornton or Mr. Wagner. Nor is there such a privilege attached to any of the offices held by the other witnesses. It is a strange doctrine in this free country where the constitution and laws have accurately marked out the rights and privileges belonging to every office. Privileges of exemption from those duties to which every citizen is liable as such, must be clearly shown, and the law by which they are authorized must be produced.

PATERSON, J. You may save yourself the trouble of arguing that point ; the witness may undoubtedly be compelled to appear.

*Emmet.* Another question has been stated ; can the witness be compelled, or would they be authorized to disclose the secrets of state ? No law-book that I have ever read or heard of, mentions such a privilege as belonging to public officers, though it is uniformly allowed to lawyers and attorneys. But in this case another answer is also obvious. If the concurrence of the president in those matters with which Col. Smith stands charged, be a secret of state, for the keeping of which there is a lawful privilege, it must be because such concurrence was within the legal sphere of the president's duties. If that be the case, let it be remembered, when I shall argue that the concurrence of the president would form a justification for my client ; at present I shall urge it thus : if the concurrence of the president was within the legal sphere of his duties, the legality of his conduct will justify those who acted by his concurrence ; of course, the court will help us to the utmost in availing ourselves of a legal and adequate defence ; and will, at least, bring the witnesses into court, to try whether they will decline answering what if they do answer, must acquit us. On the other hand, if such concurrence be not within the legal sphere of the president's duty, then as to that, neither he nor the witnesses can have any legal privilege in right of his or their offices, Supposing the witnesses are not bound to divulge the secrets of government, let them, at least,

NEW-YORK,
1806.

The People
v.
Smith.

declare whether there be any secrets of government connected with the measure for which Col. Smith stands indicted.

But it is also urged that the witnesses could not be forced to answer questions that might criminate themselves. No; but there is nothing in that argument that should prevent their being brought into court, to see whether they will make an objection which they certainly may waive. In truth, however, Col. Smith's affidavit does not lay us open to that argument; for it does not charge any one with approving of that expedition, but the president and secretary of state. Now, Mr. Madison may be called to prove the conduct of the president, and the other witnesses to prove the conduct of Mr. Madison.

PATERSON, J. Would Mr. Madison be liable to a prosecution if he answerd that the conduct of Col. Smith was with his knowledge, or knowledge and consent of the president?

*Emmet.* If the view I shall hereafter take of the statute be correct, he certainly would not.

Another circumstance has been mentioned; that those gentlemen have offered to be examined under a commission, and the court was pleased to express some surprise that such an arrangement had not been before thought of. With the utmost deference, I beg leave to answer, that the circumstance was adverted to; but neither the defendant nor his counsel are willing to accede to that arrangement. For my own part, I declare, that except upon some very extraordinary occasion, which I cannot now foresee, I never will consent to examine a witness under a commission in a criminal case, if his attendance on the trial can be forced. Even in civil causes, I have more than once had occasion to lament the inroads that are made upon oral testimony, by the increased use of written depositions; and I am convinced that the latter frequently prevent the discovery of truth. Every one knows that when a witness is examined in open court, the manner in which he answers, and the manner in which he declines to answer, are matters of public observation; and that cross-examination may draw out more than could be obtained by studied and written answers to written interrogatories. It is the wish of my client that this case shall be made as clear as possible; that the truth shall be eviscerated and brought into public view; that the allegations of the defendant, and the testimony of the witnesses may be compared and judged of by the jury and the public.

The advantages of oral testimony over written depositions, are so strikingly set forth by Sir Matthew Hale in his History of the Common Law, (vol. 2. ch. xii. p 145.) that I shall beg leave to read a short extract from it; as, perhaps, if the same reasons were assigned by myself, they might be supposed to have some personal allusions.

" The excellency of this open course of evidence to the jury, in presence of the judge, jury, parties and counsel, and even of the adverse witnesses, appears in these particulars .

" 1st. That it is openly, and not in private before a commissioner or two, and a couple of clerks; where oftentimes witnesses will deliver that which they will be ashamed to testify publicly.

" 2dly. That it is *ore tenus*, personally, and not in writing; wherein oftentimes, yea too often, a crafty clerk, commissioner or ex-

aminer, will make a witness speak what he truly never meant, by
dressing of it up in his own terms, phrases and expressions.
Whereas, on the other hand, many times the very manner of de-
livering testimony, will give a probable indication whether the wit-
ness speaks truly or falsely.   And by this means also, he has an
opportunity to correct, amend, or explain his testimony, upon far-
ther questioning with him; which he can never have, after a de-
position is set down in writing.

" 3dly.   That by this course of personal and open examination,
there is opportunity for all persons concerned, viz. the judge, or
any of the jury or parties, or their counsel or attorneys, to pro-
pound occasional questions, which beats and boults out the truth
much better, than when the witness only delivers a formal series
of his knowledge without being interrogated.   And on the other
side, preparatory, limited, and formal interrogatories in writing,
preclude this way of occasional interrogations; and the best me-
thod of searching and sifting out the truth, is choaked and sup-
pressed.

" 4thly.   Also by this personal appearance and testimony of wit-
nesses, there is opportunity of confronting the adverse witnesses;
of observing the contradiction of witnesses, sometimes of the same
side; and by this means great opportunities are gained for the true
and clear discovery of the truth.

" 5thly.   And farther, the very quality, carriage, age, condition,
and place of commorance of the witnesses, are by this means,
plainly and evi ently set forth to the court and the jury; whereby
the judge and jurors may have full information of them; and the
jurors, as they see cause, may give the more or less credit to their
testimony."

There is another objection to taking the depositions of witnesses
by commission in criminal cases, which I think irresistible; if the
witnesses swear falsely, how are they to be indicted for perjury?
In urging this argument, I can have no allusion to the witnesses
who have offered to be thus examined; but this case is so con-
spicuous and important, that every part of its proceedings may
hereafter become a precedent; and in this case the precedent
might give rise to a very dangerous practice.   I therefore feel that
I should not only be doing injustice to my client, but also injury to
the general administration of justice, if I consented to any other
mode of taking the testimony of those gentlemen than *viva voce* be-
fore the jury.

We come now to the most important question; the materiality
of the testimony expected from those witnesses.   So far as relates
to the attachment, I trust I have already convinced the court that
it ought to be laid out of consideration: *that* process being a matter
of right.   The witnesses are in contempt; when they come for-
ward to purge themselves of that contempt, then and not before,
ought the nature of their evidence to be taken into consideration.
I deem it, however, to be the most important of all questions rais-
ed in this cause; since the counsel for the prosecution resist our
application to put off the trial, on their allegation that the testimo-
ny is immaterial.   The remainder of my observations shall, there-
fore, be directed to the support of that application.

NEW-YORK,
1806.

The People
v.
Smith.

The facts which we hope to prove by those witnesses are very material, either for a complete defence or for mitigation of punishment; and in either case we have a right to ask for compulsory process to bring them into court, and for the postponement of the trial till they do come. It cannot be expected of us that we should, in this stage of the proceedings, disclose our defence, and give the opposite side advantage of a detailed argument upon the application of our evidence. We shall do enough if we show by a general view of the subject, that those facts may be applicable to our case either in justification or in mitigation of punishment.

First, as to justification. The purport of a constitution is to define the duties of the constituted authorities, to prevent their usurpations or collisions, and to limit the powers of public officers in order to protect the people from their encroachments. It seems to me, therefore, that the fair construction of our constitution, as to the right of declaring war, is that the executive shall be controlled, and deprived of that baneful prerogative which is exercised by the chief magistrate of England. If the president undertake to declare war, he becomes undoubtedly and justly liable to impeachment; but it is too harsh a construction of the constitution to say that it has any reference to the conduct of an individual acting *bona fide* under the president, and by his authority, in times and cirstances such as those when general Miranda's expedition was set on foot. No subordinate officer or private person acting by the president's authority, falls within the purview of the constitution, or becomes criminal, unless by knowingly and intentionally assisting to violate its provisions, he should involve himself in the guilt of his principal. Where, therefore, the situation of the country affords a reasonable ground for supposing that a war with some foreign power, may speedily break out, I submit that the subordinate agent, who, with the knowledge and under the directions of the president, provides or prepares the means for a military enterprize against that power, stands acquitted, and that if there has been any misconduct, it must be answered for by the superior officer alone. Who is to be the organ of congress if secret preparations for war shall have been decided upon? Undoubtedly the executive. Suppose then the head of the war department, by the desire of the president, should write to any contractor or subordinate officer to provide a million of cannon balls, or any of the other things necessary for a military expedition, while congress were sitting with closed doors, deliberating upon an avowedly hostile message sent them by the president; would the contractor come under the penalties of the law, if he accepted and executed the contract, and thereby provided and prepared the means for a military expedition? Or should he say, I will not execute the contract, or the inferior officer, I will not obey your orders; for I do not know that you have the sanction of congress, as they are still sitting in secret deliberation? I venture to assert that a more unwise or injudicious construction could not be given to the constitution, than to say that it prohibits a subordinate officer from paying obedience to the orders of his superior, or that the commands of the president would not be to him a sufficient justification of his conduct under all the circumstances of the case.

Spain had committed depredations on our territory ; the message
of the president details the particulars and recommends a hostile
attitude ; congress sit with closed doors to discuss the question.
To whom then should the people at large look for information or
guidance, but to the president ? Is it not competent to congress
to decide secretly on the propriety of anticipating an enemy before
he has matured his strength ? If they should so determine to declare
war, would they not naturally authorize the president to take all
necessary steps for attack or defence, unknown to Spain ? A citi-
zen residing distant from the seat of government, can only know
such facts as are public ; he is not likely to have direct communi-
cation as to the secret objects of the cabinet or congress. But
when he sees that Spain has commenced hostilities against us, and
finds that the president has recommended war, on which the two
houses are deliberating in secret ; when at the same time he re-
ceives satisfactory assurances that he has the approbation of the
executive, shall he be culpable if he acts on those views and on
that authority ?

NEW-YORK,
1806.

The People
v.
Smith.

Here I am met by an objection, that colonel Smith does not lay
any foundation for supposing this to be the state of the country ;
nor does he swear that he expects to prove those facts by these
witnesses. To that I answer, that perhaps we may question them
as to those facts ; but we do not complain of want of testimony on
that subject ; we may prove it by other means ; I see a very vene-
rable* witness in court, by whom we can certainly prove the state
of the country.

It is not necessary to specify in the affidavit more than we ex-
pect and want from those witnesses ; it never yet was required of
an accused that he should disclose, on a motion of this kind, all
the particulars of his defence, and how each fact is to be proved.
In this state of the cause, we may well assume circumstances of
public notoriety, and couple them with those we wish to prove by
the witnesses, in order to see whether the whole together will not
make a justification.

The argument which I have hitherto urged from the state of the
country, acquires infinitely more force when you consider the pre-
cise charge in the indictment, which is framed pursuant to the
statute for *setting on foot, providing and preparing* the means for a
military expedition or enterprize.

PATERSON, J. What are the words of the statute ?

*Emmet* read from Graydon's Dig. p. 70. the 5th section of the
act of 5th June, 1794, " If any person shall, within the territory or
jurisdiction of the United States, begin or set on foot, or provide
or prepare the means for any military expedition or enterprize to
be carried on from thence, against the territory or dominions of
any foreign prince or state with whom the United States are at
peace, every such person so offending shall," &c.

It appears then, that the indictment and statute are only pointed
against *preparatory* acts for carrying on an enterprize against a
power at peace. Will the counsel for the prosecution offer evi-
dence of the sailing of the Leander, or of any act of hostility ? If

*The Vice-President,

NEW-YORK, 1806.

The People v Smith.

they do, it must be in order to lay matter of aggravation before the jury, and let them consider how far that is consistent with their denial of our right to prove matter of mitigation in the same way. But as to the acts charged in the indictment, they are only preparatory, and independent of any actual hostility. As to them, the state of the country forms an irresistible justification both of colonel Smith and of the president The constitution indeed does not allow the latter to declare war, but does it forbid his providing and preparing the means of carrying it on, while congress are in actual and secret deliberation whether *they* shall declare war against a nation that is committing and provoking hostilities? Spain, indeed, was technically at peace by the treaty of San Lorenzo, but she was actually at war by the law of nations; she had broken that treaty, plundered our ships, invaded our territories, and carried our citizens from thence as prisoners by military force. Such a nation is not entitled, if I may say so, to the benefits of this act, the object of which is, that so long as any prince or potentate shall act towards us with perfect amity, and not by equivocal or unfriendly conduct, render preparatory measures for war advisable, so long as it shall be forbidden under the penalties of this law, to any individuals to break that amity, and by unauthorized acts to endanger the peace of the two countries. But if the foreign power shall itself have broken that amity, and shall have given just grounds of war, no government ought to omit " providing and preparing the means" for military enterprizes; nor could any law have intended to prevent the preparatory efforts of individuals for subduing the public enemy.—The memorable congress that commenced your revolution did not hesitate to provide and prepare the means of meeting the English before actual war was declared; nor did it censure or discountenance those patriots, who, unauthorized by any orders, and before the formal declaration of war, possessed themselves of Ticonderoga and Crown Point.

The circumstances of the times, we have shown, justified the president in giving his approbation, and my client, under that approbation, in providing and preparing the means of a military enterprize against Spain. And surely no enterprize could be more useful or effectual for drawing the enemy from our southern and western frontiers; none more worthy of the exalted and philosophic mind of our chief magistrate; none more consonant to the enlightened and philosophic views of society and politics, which he has exhibited to the world, than an expedition to liberate South America; to destroy at once Spanish tyranny and power on our own continent; to enfranchise, by one effort, millions of our fellow creatures from the most frightful bondage; and to lay the foundations, in so large a portion of the globe, for the freedom and the happiness of man!

PATERSON, J.—You state in the affidavit that it was done with the knowledge and approbation of the president, but is it stated in the affidavit that he *authorized* the fitting out of the expedition?

*Emmet.* I conceive it was not necessary; for though I have argued upon the effects of an authorization, it was only to show that the argument of the adverse counsel went much too far, when they contended that the president could not authorize any such

measure. For our defence, it will be only necessary to show that the president was, under the circumstances of the times, warranted to provide and prepare the means for a military expedition; and that in what he might do, we acted with his knowledge and approbation. *Qui prohibere potest et non prohibet, jubet.* The knowledge and approbation of the chief magistrate and heads of departments, if we shall prove them to have been sufficiently express and positive, will amount to a justification; but even if we shall fail in establishing them to that extent, they will still afford very powerful inducements for mitigating the punishment.

NEW-YORK, 1806.

The People
v.
Smith.

This is denied on the other side; but I would ask, if it could be proved that this enteprize was carried on *against* the president's express order, would not that be matter of aggravation? If it would, surely the reverse must be matter of mitigation.—The mistake into which a defendant may have been led by the approbation of the government, and the innocence of his motives, must surely mitigate a discretionary punishment. In this case we do not rely upon a mere general and vague approbation of the measure; we will show that approbation was given to this very defendant's being concerned in it.

We are told, however, that no evidence, which only goes in mitigation of punishment, should be laid before a jury; but that it is only cognisable by the judge who is to apportion the punishment, and that therefore the want of it forms no ground for putting off the trial. This doctrine, permit me to say, is contrary to every day's experience; for who, that has attended the commonest trials for assault and battery, does not know that all matters connected with the crime, though not making any part of the issue, whether they preceded, accompanied or followed the fact charged, are given in evidence on the trial; and that the judge, after hearing those matters, varies his sentence according to the case, for perhaps one cent to a very exemplary fine and imprisonment? But what reporters can we quote on this subject? I verily believe that no lawyer, who ever undertook to report a case, thought this a matter of sufficient difficulty or importance to be worth noting. It happens, however, that we can cite a printed case in which the point has been decided, and that only, because the trial having been taken verbatim, the most insignificant circumstances attending it have been preserved. The case I allude to is that of the earl of Anglesea, in the 9th State Trials, p. 335. There, although it was resisted by the defendant's counsel, the counsel for the prosecution stated and proved matter of aggravation, entirely distinct from the assault on which the indictment was framed; and the court considered his right of doing so as unquestionable. It has been asserted on the other side, that the facts stated, accompanied the assault, and therefore were necessarily admitted; but if so, how came the defendant's counsel to resist their introduction? On looking into the case, the court will find those facts which were introduced for the purpose of aggravation, happened the two days preceding the assault. A distinction is also taken, that what was there stated, was in aggravation, and that what we wish to introduce before the jury, is in mitigation of punishment. What principle of law sanctions this distinction: Those who have a right to hear the one surely have a right to hear the

NEW-YORK,
1806.

The People
v.
Smith.

other. Unfortunately also it seems contrary to the case of The King v. J. Mockler, 1 M‘Nally's Rules of Evidence, p. 320. where Downes, justice, admitted evidence of character *on the trial* for uttering couterfeit coin; *as the punishment was not certain, but discretionary in the court.*

But the counsel on the other side maintain that such evidence must have been received to meet the issue of not guilty; it being very unlikely that a person of good character would be guilty of such a crime. To this surmise. the answer is obvious; *that* was not the reason assigned by the court. It happens also that I was concerned in that cause for the defendant, and have such a recollection of it as enables me to show the learned counsel's supposition to be groundless. The fact was clearly proved and indeed admitted; but the defence was, that the defendant was a silver-smith, and made out of pure metal, shillings which were rather more valuable than the current coin, which by being worn down was not worth more than nine pence, and of which there was an actual scarcity This certainly formed no legal defence; but on its being proved that the counterfeit was as good as the curr--nt coin, the judge admitted evidence of character , not to controvert the guilt, which was unquestionable; but that it might be considered in mitigation of punishment.

The Chevalier D'Eon's case (3 Burr. 1513.) is very much relied on by the opposite side, as proving that evidence in mitigation should not be received on the trial; but that it should be laid before the judge after verdict, by affidavit; and that the want of it forms no ground for putting off the trial. Let us, therefore, shortly examine that case. The first position is supported, as the counsel think, by this expression of Lord Mansfield: "If their knowledge relates to any circumstances that may serve to mitigate the punishment, in case he should be convicted, *that* sort of evidence will not come too late after conviction of the offence, and may be laid before the court by affidavits." True, it will not come *too late* after conviction; but has his lordship said that it would come *too soon* before verdict? True, it *may* be laid before the court by affidavits; but has his lordship said that it *ought not* to be laid before the court *viva voce*, on the trial? That sentence, however, has been misconceived by the learned counsel; it only refers to the peculiar circumstances of D'Eon's case, and does not purport to lay down any general principles whatsoever This will instantly appear by comparing the report of the same case, in sir W. Blackst. 510. with that in Burrows. The motion was made in *Trinity* term; the trial could not take place till after that term; and, as it was an information, judgment could not be given till the November or Michaelmas term; and Mr. Morton and Mr. Ashhurst argued, I confess, I think unanswerably, for putting off the trial, that it could not, at the utmost, cause above eight days' delay as to the sentence, if the defendant should be ultimately convicted. Lord Mansfield, however, said in substance, your witnesses are out of our jurisdiction in France; and it is not either in your power or ours to compel their attendance; but you expect them here, you say, next term; they will therefore come, if at all, before sentence; and as they can be only in mitigation (this being an information for a libel, which ad--

mits of no justification) you can still have the benefit of their testimony ; though they should not be present on the trial *their evidence will not come too late next term (when you expect them) after your conviction, and you can lay it before the court by affidavit.* This is the true explanation of that sentence on which the opposite counsel so much rely ; and permit me to observe upon that case, even were it more favourable for them than in reality it is, that, since truth is settled to be an inadmissible justification on an indictment for a libel, it is manifest the exclusion of those witnesses on the trial of the issue, worked an injustice to the defendant. Indeed, any one who now examines that decision with impartiality, will, I think, be convinced that the defendant was very hardly dealt with ; and, what surely will not recommend the precedent to this court, it appears from 1 Sir Wm. Blackst. 517. as if this hard treatment sprung from a spirit of complaisance to certain foreign ministers.

The case, however, affords no ground for arguing that matter in mitigation of punishment should not be given in evidence on the trial—and every day's experience shows that it may. Even for the information of the judge, if he alone is to take cognizance of the testimony, it is advisable that he should be informed by *viva voce* examination, which is superior to written affidavits, and which affords the advantage of sifting out the truth by pointed and cross-examination. Besides, if we are not allowed compulsory process for enforcing the attendance of those witnesses before the jury, and a postponement of the trial till they can be brought into court; by what process or authority of law are we to obtain their affidavits in mitigation of punishment? I know of no process by which you can compel any man to swear an affidavit : and here let me observe, that in the Chevalier D'Eon's case, his witnesses he admitted were friendly, and were willing to be examined—there was therefore no danger but that he could procure their affidavits after conviction. Col. Smith does not pretend that his witnesses are friendly, or willing to be examined.—How then, I again ask, if this trial should not be postponed until the attendance of the witnesses can be enforced and their evidence obtained under a compulsory process, is the defendant to procure those affidavits, which might be laid before the court, and ought to diminish the punishment?

Besides, it is the right of the jury to recommend to mercy ; and how can they do so, if no extenuating circumstances are permitted to reach their ears? The president's approbation and knowledge are facts, which, like most other facts, may be contested, and upon which, therefore, the court entertain some doubts. Would not the recommendation of the jury, finding those facts and grounded on their declared belief of them, have infinite weight in removing the doubts of the court and influencing its conduct? Indeed, from every view I can take of the subject, I am convinced that the original and correct mode of receiving any testimony, whether to the issue, or in aggravation or mitigation of punishment, was *viva voce* on the trial ; and that the introduction of affidavits after conviction is a modern and irregular invention, tolerated for the convenience of the defendant, to whose benefit it has hitherto been most frequently applied : but I confess I am surprised to hear it argued, that the innovation should totally supersede the ancient, and I think the wisest practice.

NEW-YORK,
1806.

The People
v.
Smith.

Another reason for putting off the trial, presents itself from an examination of D'Eon's case coupled with Col. Smith's affidavit. In that case, the defendant gave some reason to believe that the witnesses were prevented from attending by the interference of the prosecutor; and Mr. Justice Wilmot declared (1 S. W. Bl. Rep. p. 516.) that if *that* were clearly established, he should be for putting off the trial for ever. In this case, Col Smith swears that he believes those witnesses are prevented from attending by the interference of the president, who has directed this prosecution. The fact is not denied, and what might be a justification of the fact, is not sworn to. Upon that ground, which is admitted to exist with us, and which Lord Mansfield said in D'Eon's case (3 Burr. 1515.) would be sufficient for putting off the trial, till the witnesses could be had, we ask, even if you should be against us on the other points, that the trial may be postponed.

I have trespassed so long on the time of the court, and on the debilitated health of one of its members, that I know not what apology to offer —I shall not increase my offence by any longer intrusion, except to return my thanks for your very patient and favourable attention.

*Harison.* I am now to close the argument on the part of the defendant, and to offer my sentiments upon a subject that is nearly exhausted. A sense of the duty I owe to my client, and a regard to public justice, are the motives by which I am influenced, and which I hope will apologize for observations that may appear to be superfluous, and perhaps have been already offered.

Before, however, I proceed to the main questions that have arisen, I beg leave to advert to an observation which fell from the counsel for the prosecution. He indeed declared our form of government to be the best in the universe; in the preservation of which every citizen was of course deeply interested. And yet, he expressed great surprise that a prosecution such as this, which he considered as of a very *ordinary* nature, should bring together so numerous an assembly, and excite such universal interest and attention. Perhaps this observation might have been spared; for without adverting to the previous proceedings in this case, the nature of the prosecution, and the high authority by which it was instituted, would sufficiently account for the effects it has produced. For my own part, believing the criminal system of the United States to be the most pure and chaste and mild and perfect that the world ever beheld; in fact, I consider it as a most valuable inheritance belonging to the citizen. It has, therefore, called forth the public attention; and the numerous audience that is assembled upon this occasion, must be considered as an expression of its sentiment. The remarks which I have made upon the criminal institutions of the United States, and to which I shall hereafter allude, will, I trust, be found not wholly inapplicable to the cause before the court. I proceed to discuss the questions in the order that they have been stated. The first is, whether an attachment should issue for the non-attendance of the witnesses.

Here I observe that according to the mild system of our laws, the innocence of the defendant is always to be presumed until the contrary appears. The public has an interest in guarding the inno-

NEW-YORK,
1806。

The People
v.
Smith.

cent, at least equal to that of punishing the guilty. It is, indeed, our first duty to protect innocence ; and hence, the very constitution of this country has provided that the accused shall have the necessary means of defence ; among which compulsory process for his witnesses is expressly included. This is a provision of great importance, and distinguishes our criminal code from that of other nations. In the origin of the English law no witness was to be examined for the prisoner, at least not upon oath ; though by a modern statute, a different regulation has been introduced ; and by a favourable construction of that statute, the prisoner has been held entitled to process against his witnesses. In our country, however, this matter has not been left to construction ; nor does it depend upon legislative pleasure. It is a fundamental article of the constitution, which imparts a right to the accused, that he cannot be deprived of, and which courts of justice are bound to protect。

It is not pretended that the peculiar character and situation of the witnesses exempt them in this case from the duty of attendance. Public officers, however dignified, are not excused from appearing to vindicate innocence。 Our law contains no dispensation from this duty. The defendant has a right to the benefit of their evidence ; and the court is bound to secure a right so essential to the complete protection of life, liberty and property. If, therefore, this right exists in the defendant to prove his innocence, there must exist a power to compel the attendance of reluctant witnesses ; otherwise the right would be nugatory, and it would be in the option of the witnesses to defeat the provisions of the constitution.

It is always to be remembered that at the last term affidavits were produced to show that the witnesses were necessary to our defence. The court then directed subpœnas to be issued, and the trial to be deferred. The due service of the subpœnas has been fully proved, and the defendant has complied with every thing that was requisite on his part. Why then shall the attendance of the witnesses not be procured ? It is said that they have written a letter to the court, stating their excuse. But I may ask whether such a letter can be considered as a legal apology ? If the witnesses had any excuse to offer, it should have been presented in another shape。 The court certainly can pay no attention to this document ; for though in one instance the rescript or letter of a British king was received as evidence, yet this was always considered as an improper proceeding, and not as a legal precedent. Even in England, therefore, a mere letter would not be thought worthy of notice ; and in this country neither the president nor any other officer, can be heard in a court of justice to exculpate himself from a contempt, unless upon oath.

I go on to remark that whatever might be the practice of English courts as to enforcing the attendance of witnesses, the power and the duty of the American courts would not be affected by it. I might therefore be silent as to this head of the argument ; but lest the court should think it of importance, I shall bestow some few minutes to its consideration. The counsel for the prosecution have supposed that attachments against witnesses for contempt in non-attendance, owed their origin to the statute of Elizabeth, and that they did not exist at common law。

NEW-YORK,
1806.

The People
v,
Smith.

On the contrary, the passage from Blackstone which has been quoted, shows that from the earliest ages of the law, the superior courts of justice have used the method of punishing contempts by attachment.  Contempts committed by witnesses " by making default when summoned, refusing to be sworn, or examined, or prevaricating in their evidence when sworn," have, according to the learned commentator, always been punished in this manner.  Attachments in such cases are therefore as ancient as the laws themselves; and did not, as the counsel for the prosecution contend, grow out of the statute of Elizabeth.  If so, all the fabric which those gentlemen have endeavoured to raise upon this foundation, must inevitably fall to the ground.

It is true, as they have stated, that Lord Chief Justice Lee is made in one case to say that " attachments are a new practice; that he remembered the first motion for them." But there must be some mistake in this reporter; for it is laid down in a case mentioned in Lilly's Register, that an attachment may be granted against witnesses for their non-attendance, and this is said in a case which took place long before the period to which the memory of Lord Chief Justice Lee could have extended.*

Besides, the authority of Lord Mansfield, in the case cited from Douglas, is at variance with the assertion of the learned counsel. His Lordship says, " the courts of Westminster-Hall, most clearly now (and they *also* did *s; before the statute*) proceed against witnesses who wilfully absent themselves, as for a contempt." Thus, therefore, Lord Mansfield, according to Douglas, one of the most eminent reporters of the English bar, is at variance with the counsel for the prosecution.  The court must determine as to which it is probable should be mistaken.

But the gentlemen for the prosecution say, that if we are entitled to any thing, it would be only to a rule against the witnesses to show cause; and if this was all the dispute between us, it would be of little consequence whether in the first instance the attachment should be granted, or a rule to show cause why it should not be issued.  The cases, however, which they have quoted respecting this matter are, except one, in civil causes.—The only one of a criminal kind, in which the question arose, and which is in the 7th Term Reports, is a case where the court doubted their authority to have originally issued the subpœna.—They therefore granted a rule to show cause in the first instance, that the parties might argue *that* point if they thought proper; and being satisfied upon it, the attachment was finally issued, the rule being made absolute, and Lord Kenyon saying that the application was warranted by precedent.  It will be seen too, that in the cause cited in the notes to that case, the court of King's Bench had, without any question, issued an attachment in a criminal case in the first instance.  So that from authority, and from reason, upon the principles of the

* The case in 1 L. P. Reg. 162. is said to have taken place in 1655. The *dictum* of Lord Chief Justice Lee, was in 1748; but perhaps he spoke of an attachment in civil causes.  It is most probable they had in such cases fallen into disuse after the statute, when the remedy by action may have been preferred, at least for some time.

common law, and on precedents from time immemorial, it appears that courts possess a right to enforce obedience to their precepts by process of attachment.

Here Judge PATERSON asked whether this power of punishing contempts, was not incident to courts of justice? and upon the counsel's replying that it certainly was, according to the scope of his argument, the judge observed that he had always considered it so.

Mr. Harison then proceeded in the following manner :

Taking it then for granted (which perhaps no man of legal information could have doubted) that the power to punish contempts is, by the principles of the common law, inherent in every superior court, and that process of attachment is to be resorted to for that purpose, it will follow that unless the witnesses are entitled to exemption from the general rule on account of their official characters, attachments ought to be granted. But any objection on that ground is disclaimed, and would not be tenable.

It is nevertheless objected that the attendance of these witnesses ought not to be enforced, because the nature of the evidence expected from them is such as would criminate themselves. I shall certainly not attempt to invalidate the maxim, " that no one is bound to inculpate himself." It is too well established, and too sacred in its nature, to admit of a dispute. The court will, in every instance, secure to the witnesses the benefit of the rule ; and for that purpose will examine the interrogatories that may be put to them, and even have the questions reduced to writing for the sake of precision. But then the court will never prejudge the question in this state of the business, when it cannot appear that the testimony of the witnesses will of necessity inculpate themselves. For, granting that the participation of the president and great officers of state in Miranda's enterprize is to be established by the evidence, still no man need be called upon as a witness to accuse himself. Mr. Madison might speak only as to what relates to the president, and other members of the administration ; and they again might be examined with the like qualification of not being called upon to accuse themselves. At present, the court cannot determine for the witnesses, whether they will, or will not insist upon the privilege of not answering to those things which would involve their own crimination. It is a privilege which the law has conferred for their benefit ; and which, in the course of examination, they might think proper to renounce ; since, according to the legal maxim, " Quisquis renuntiare potest juri pro se introducto." At any rate, they are not for themselves to judge that they can give no evidence which the court would receive or compel ; but they must come in person, and submit themselves to the judgment of the court upon the questions as they arise.

One other objection has been taken to the issuing of an attachment in this case, flowing from the supposed deficiency of the tender made to Mr. Madison for his expenses. But it is obvious that he had waived the objection, and he would, probably, have disdained as a subterfuge, what the legal ingenuity of learned counsel has pleaded in his excuse. Indeed, the constitution has directed that the accused shall in all cases have compulsory process for his wit-

nesses, and it is silent with regard to defraying their expenses. If this should be deemed necessary to secure their attendance, the poor (though innocent) might lose the benefit of this provision. Such a construction of the constitution certainly will not be adopted; and, if I am not misinformed, a contrary doctrine has received the sanction of the judges in one of the courts of the United States. It should also be considered that in civil cases, a party injured by the non-attendance of witnesses, may have some reparation from the recovery of damages. But in criminal cases, such remedy would be wholly inadequate, even if it could be obtained by any legal proceeding. We trust, therefore, that the court will grant our motion for an attachment.

I now proceed to the second, and perhaps more important question, whether the trial should be deferred until the attendance of the witnesses can be enforced. If the principles which I have alluded to, as to the rights of the accused, are correct, and that the most dignified characters in the union are obliged to attend for the protection of innocence; then even the president himself, who sustains the most exalted character upon earth, that of the chief magistrate of a free people, clothed as he is with great constitutional privileges, and bound to the most important duties, vested with the whole executive power, and considered as the common parent of the American people, might probably be required to attend the trial, if his evidence was requisite for our defence. But it is not necessary for us at present to insist upon this position; we ask only for the attendance of his ministers; and though perhaps it may not be reasonable that they should be dragged from one end of the continent to another upon light and trivial occasions, yet if affairs of state and their important avocations are at all times to shield them from attendance, our best and dearest interests may be put in jeopardy, and the means of protecting innocence totally fail. In all these cases, I take it, the court will inquire into the nature of the evidence, and see whether it is relevant to the cause to be tried. We contend that the evidence is relevant, whether it goes in justification of the defendant, or in mitigation of the crime. If in justification of the defendant, then it is admitted that it would be proper to defer the trial. This, therefore, is the first subject for our consideration; and it will depend upon the question whether the defendant will be justified in a participation in Miranda's enterprize, by the president and chief officers of the administration having known and approved of the plan.

The gentlemen concerned for the prosecution tell us that the constitution has invested congress alone with the power of declaring war; and that even the positive orders of the president (much less his knowledge or approbation) would be no justification for the defendant.

We admit, indeed, this constitutional provision; but on our part, we contend that actual war may exist without any declaration. The necessity of a declaration to the existence of a public war, has, indeed, sometimes been insisted upon; but is contrary to the doctrine of Grotius, Bynkershoek and other approved writers. Hostilities committed by the public authority of one government against another, must certainly create a state of war, independent

of any declaration; and a state of actual war subsisting between Spain and the United States, would be a justification to the defendant upon this indictment.

Besides, by the constitution of the United States, the supreme executive power is vested in the president; and it is the presumption of law that this high and responsible officer will perform his duty. The citizen, therefore, when he acts with the knowledge and approbation of the president must stand justified, unless the case is such as could not, upon any construction, fall within his legal powers. Confidence is to be reposed in the magistrate at the head of public affairs, and though the president might be punishable by impeachment or otherwise, for his misconduct, the private citizen should be safe when acting under the authority of the executive.

If actual war, therefore, may exist without a declaration, and without the concurrence of congress, then I would ask, whether the supreme executive power would not be justified in directing hostilities against the enemy? Suppose, for instance, that the British government should commence an actual warfare against us, and meditate aggressions from the province of Lower Canada, would not the president be justified in making an immediate diversion in another quarter, though no actual invasion had taken place, if he could thus defeat the design of the enemy? Or would it in such case be necessary for him to convene congress and obtain a declaration of war, when in the interim our territories might be invaded, and irreparable mischief done to our citizens and their possessions? Suppose, again, that a military expedition against the more distant territories of Spain should be found necessary, to prevent an attack by them upon our south-western frontier, would it not be competent for the president to direct such an expedition in a case that would not admit of delay? The authority of the president in such circumstances may not, indeed, be given by the express terms of the constitution; but it is virtually implied and contained in the supreme executive power with which he is invested— a power which, in all governments of every form, must sometimes act upon its responsibility for the protection of the public, even where no express power is delegated. When it neglects this high duty, it becomes an object of scorn; and for the performance of it, if the president should even exceed the bounds of express constitutional power, he would rise to a fault which his country would applaud, and which the rest of the world could not censure.

If there are cases then in which actual war may exist without a declaration of it by congress, (and unless I have been misinformed, the case of Tripoli was originally such,) then there may be cases in which the president may lawfully order or approve of military enterprizes without the sanction of congress. Now, if such cases can exist, the present is, perhaps, a case containing all the circumstances which would justify the president in the exertion of extraordinary powers. The situation of the two countries was in reality a state of war, as we expect to show from the message of the president and the proceedings of congress. It was right in the president to attack the enemy in his most vulnerable part; and the fitting out of the expedition under Miranda, if done with the know-

ledge and approbation of the president, was highly meritorious. For as the indictment charges the defendant with preparing the means for a military expedition; and as military enterprizes are within the proper province of the president's authority, if he approved of the expedition, (as we say he did) then the defendant stands justified. A private citizen, acting with the approbation of the executive, in a military expedition against the enemy, wants no other justification. He is not presumed to know the secrets of state, which belong to the president and his ministers. When they approve of the expedition, as Col. Smith says they did in this instance, it must be presumed legal; and all military enterprizes would be delayed and rendered precarious, if the officer was to wait for legal explanations, or acts of congress, before he complied with the wishes of the executive power. I have already said that the president is to be considered as the parent of the American family. As such, he was bound to warn them against the commission of any criminal proceedings that came to his knowledge, and he could not neglect to do so without a violation of his duty. Even if this was doubtful upon general principles, the act of congress, upon which the indictment is framed, enjoins him to prevent the commission of the offences therein mentioned. Consequently, the presumption of the legality of those expeditions which he approved, would be strengthened by the consideration that it was expressly made his duty to prevent them, when they came to his knowledge, unless they were against an enemy. The private citizen, therefore, must be justified under the circumstances stated, when he undertakes to forward an expedition, which has been approved by the president.

I proceed now to the next branch of the argument. If the evidence required will not justify the defendant, does it go in mitigation of his defence, and ought the trial to be deferred upon this account?

Here, if we suppose that every citizen undertakes a military expedition upon his own risk, and that he cannot be justified by the mere approbation which the president may have bestowed upon the enterprize; still, as the punishment is discretionary, the motives of the defendant should be inquired into, and all the circumstances which tend to show that he acted from no improper or wicked design, should be admitted to alleviate the offence.

One of the greatest orators and lawyers of the present age, when speaking of the English criminal law, says that it is " the purest, the noblest, the chastest system of distributive justice, that was ever venerated by the wise, or perverted by the foolish, or that the children of men in any age or climate of the world have ever yet beheld." This is, indeed, a very great and striking elogium; but, perhaps, more applicable to our criminal system, than to that of England. We have moderated the unreasonable severity of their code, and made the protection of the accused more peculiarly our care, at the same time that we have preserved every thing that was good and valuable in their system. Thinking, therefore, as I do, of the criminal system of this country, and supposing it entitled to all the praise which Mr. Curran has given to that of England, I cannot believe that it can be so defective as to trust ?

NEW-YORK,
1806.

The People
v.
Smith.

discretionary punishment of offences to the court, according to the circumstances of the case ; and yet not supply the means to the accused of manifesting those circumstances upon the trial. If our system is perfect, it must proportion punishments to the offences, and will not consider the stain to be equal when the whole body is clothed with corruption, and when the spot is so small that the microscopic eye can scarcely discover it. The difference of offence must necessarily imply a difference of punishment, and this again implies an examination of all circumstances, which must be had according to the language of the poet,

" *Ne scutica dignum, horribili sectere flagello.*"

But this examination can never take place, if the evidence which goes in mitigation, the evidence which shows the real motives of the defendant, and the circumstances of the case, is excluded from the trial. The defendant, if he has a right to justice, has a right to acquittal if innocent; and if guilty, to show what was the precise extent of his offence, that he may be punished accordingly. It is in vain to say that evidence in mitigation may be received by affidavit after the trial. For this is a novel practice permitted by the indulgence of the courts, where the regular time for offering the evidence has elapsed. There is no compulsory method to oblige witnesses to make these affidavits. If they are so disposed they may indeed do it; but they may also refuse if they think proper; and thus if the doctrine contended for on the part of the prosecution is to prevail, there will arise this legal solecism, that the defendant shall have a right to be judged according to the degree of his guilt, and yet shall possess no legal means to ascertain that degree, by an explanation of his motives or other circumstances, which, though not amounting to a justification, may fix the relative malignity of the crime.

It is said, indeed, that this kind of evidence can only serve to mislead the jury ; but I ask, by what kind of logic is it permitted to the public accuser, to produce all the evidence that will go in aggravation of the crime, (whatever may be its effect upon the mind of the jury) and to exclude all that would tend to mitigate the offence, even where there is no other certain way of bringing it before the court, except upon the trial? If this is really to be considered as the law of our country, then is our boasted system of criminal law miserably defective in a most important point. We have shown to the court by the case of Lord Anglesea, that the public prosecutor was suffered to give evidence in aggravation, because " the fine which the court was to impose was discretionary, and would be greater or less in proportion to the nature of the offence ; and, therefore, every thing was proper to be laid before the court that might be an ingredient in their consideration for the imposing that fine." And, surely, if this was a reason for giving evidence in aggravation, the same reason would legalize evidence in mitigation of the offence.

The counsel for the prosecution upon this part of the argument, seem to rely upon the case of the Chevalier D'Eon as reported by Burrows; first, to show that evidence in mitigation comes properly

NEW-YORK,
1806.

The People
v.
Smith.

after the trial; and secondly, that the want of it is no reason for postponement.

On our part it is admitted that the case in Burrows is law, and whenever a case similar to it shall arise, it ought to govern. But it was a case, the circumstances of which were extraordinary, and from which no conclusion can be drawn to affect the present. In the first place, no process whatever could there reach the witnesses, and if they gave evidence at all, it must be because they were well affected towards the defendant, and willing to testify on his behalf. If, therefore, they were expected to come voluntarily as witnesses to the trial, they would also voluntarily make affidavits in mitigation of the offence, if they could do so with propriety. In both cases they could not be affected by the process of the court; and their conduct depended upon their volition. So that the defendant lost nothing by their non-attendance upon the trial.

Again, it is observable, that Lord Mansfield says their evidence, if in mitigation, *may* be received after the trial. But his Lordship does not say that evidence in mitigation could not be received upon the trial. And if it could not, why enter into all the other reasoning, when this at once would have been a conclusive argument?

Granting, therefore, that where the witnesses are beyond the reach of process from the court; where their evidence will be merely in mitigation; and where, if they attend at all, it must proceed from their own good will, that the trial ought not to be deferred for their non-attendance, (which is all that the case from Burrows establishes,) we cannot draw the consequence either that evidence in mitigation could not be heard upon the trial, or that, if the witnesses were under the controul of the court, and ill affected towards the defendant, the court would not defer the trial to procure their testimony.

On our part, besides the case of Lord Anglesea from the State Trials, we have also upon this subject produced to the court the cases from M'Nally, to show that where the punishment is discretionary, evidence of character may be produced upon the trial, to inform the mind of the court as to the fine to be imposed. One of the counsel associated with me appears to have been concerned in one of those cases, and has stated the circumstances of it to the court. The counsel for the prosecution contend, that these cases only show that character may be given in evidence upon a criminal prosecution; and they contend that the only reason why such evidence is ever admitted, is because it demonstrates the improbability that a man of such a character would be guilty of such a crime.

We admit that this kind of proof may, in some cases, be properly given for the purpose stated by our opponents; for the evidence may be so equally poised, that even the circumstance of character may turn the balance. But the cases in M'Nally do not go upon this principle. They admit the offences to have been fully proved, and state the evidence of character to have been received merely to guide the discretion of the court as to the extent of the punishment. Either, therefore, these cases must not be law, or they show that evidence in mitigation, where the punishment is discretionary, is proper upon the trial.

I have now gone through the argument which I proposed to lay

before the court. If we are right, then the beauty or harmony of our criminal system is preserved throughout all its parts; the right of the accused to have compulsory process for his witnesses is maintained; and he is enabled, not only to manifest his innocence, if the evidence will support it, but, if he is not perfectly innocent, to show the shade and colour of his offence, that the punishment may, by the court, be proportioned to it.

I conclude with observing, that the interest which the public has taken in this cause, has perhaps been sufficiently accounted for. It is a state prosecution, instituted by the president's orders, for acts done with the president's knowledge and approbation. It is, therefore, highly important; and the sense of its importance may perhaps have been heightened in the public mind, by seeing the learned judge of another district called upon to assist the public prosecution, and to lend his exertions and talents in support of the prosecution.

NEW-YORK,
1806.

The People
v.
Smith.

### *Thursday, July 17th,* 1806.

PATERSON, J. It appears to the court, that James Madison, secretary of state, Robert Smith, secretary of the navy, and Jacob Wagner and William Thornton, who are officers under the department of the secretary of state, have been duly served with subpœnas to attend as witnesses on the part of the defendant, and that they do not attend pursuant to the process of the court. As the facts charged in this indictment, if committed at all, were committed at the city of New-York, the court could not perceive how the above-named persons, who reside at the city of Washington, and were there during the transaction, could be material witnesses on the trial of the indictment; and were of opinion that, under such circumstances, an affidavit in common form was not sufficient to put off the trial. The consequence is, that the court would inquire into the grounds of the general allegation set forth in the common affidavit, and insist upon the defendant's stating the point of materiality, which he expected to prove by these witnesses. Perhaps the defendant, by stating particulars in his affidavit, and the material facts which he intended to prove by their testimony, might remove this doubt, and induce the court to grant his application. This was the substance of the opinion delivered by the court on Monday, and which, on a review, are considered to be correct, and perfectly consistent with the principles and usages of law. The result of this opinion has been, that the defendant has come forward with an affidavit stating the material facts, which he conceives he will be able to prove by the evidence of Mr. Madison, Mr. Smith, Mr. Wagner and Mr. Thornton. This part of the affidavit runs in the following words: "And this deponent farther saith, that he hopes and expects to be able to prove by the testimony of the said witnesses, that the expedition and enterprize, to which the said indictment relates, was begun, prepared and set on foot with the knowledge and approbation of the president of the United States, and with the knowledge and approbation of the secretary of state of the United States. And the deponent farther saith, that he hopes and expects to be able to prove, by the testimony of the said witnesses, that if he had any concern in the said expedition and enterprize, it was with the approbation of the president of the United States and the said secretary

of state.  And the deponent farther saith, that he is informed, and doth verily believe, and hopes and expects to be able to prove, by the testimony of the said witnesses, that the prosecution against him for the said offence charged in the said indictment, is commenced and prosecuted by order of the president of the United States.   And the deponent farther saith, that he has been informed and doth verily believe, that the said James Madison and Robert· Smith are prevented from attending by order, or interposition of the president of the United States."

In consequence of the foregoing statement, the defendant has moved the court, 1. To postpone the trial.  2. For an attachment against those absent witnesses.  These questions have been ably and elaborately argued by the counsel on both sides.  They are important both as to their general nature and as to their immediate pressure and bearing on the cause now at issue ; and I have given them all the consideration that my feeble habit of body would permit.

The first question is, whether the facts stated in the defendant's affidavit be material, or ought to be given in evidence, if the witnesses were now in court, and ready to testify to their truth ? Does the affidavit disclose sufficient matter to induce the court to put off the trial ?  As judges, it is our duty to administer justice according to law.  We ought to have no will, no mind, but a legal will and mind.  The law, like the beneficent author of our existence, is no respecter of persons; it is inflexible and even-handed, and should not be subservient to any improper considerations or views.  This ought to be the case particularly in the United States, which we have been always led to consider as a government not of men, but of laws, of which the constitution is the basis.

. The evidence which is offered to a court must be pertinent to the issue, or in some proper manner connected with it.  It must relate and be applied to the particular fact or charge in controversy, so as to constitute a legal ground to support, or a legal ground to resist the prosecution.  For it would be an endless task, and create inextricable confusion, if parties were suffered to give in evidence to the jury whatever self-love, or prejudice, or whim, or a wild imagination might suggest.  This is an idea too extravagant to be entertained by reflecting and candid men; as it would, if carried into practice, quickly prostrate property, civil liberty, and good government.  Law would become a labyrinth—a bottomless pit ; and courts would be perverted from their original design, and turned into instruments of injustice and oppression.  A line must be drawn—a line has been drawn on such occasions, which it becomes the duty of judges to pursue.  If there be no line, any thing and every thing may be given in evidence.  Where shall we stop ?  What is the rule which we find to be laid down for our guidance ?  The evidence must be pertinent to the issue.  The witnesses must be material.  If the evidence be not pertinent, nor the witnesses material, the court ought not to receive either.  Let us test the affidavit of the defendant by this principle or rule. The defendant is indicted for providing the means, to wit, men and money, for a military enterprize against the dominions of the king

of Spain, with whom the United States are at peace, against the form of a statute in such case made and provided. He has pleaded not guilty; and to evince his innocence, to justify his infraction of the act of congress, or to purge his guilt, he offers evidence to prove, that this military enterprize was begun, prepared, and set on foot with the knowledge and approbation of the executive department of our government. Sitting here in our judicial capacities, we should listen with caution to a suggestion of this kind, because the president of the United States is bound by the constitution to " take care that the laws be faithfully executed." These are the words of the instrument; and, therefore it is to be presumed, that he would not countenance the violation of any statute; and particularly, if such violation consisted in expeditions of a warlike nature against friendly powers. The law, indeed, presumes that every officer faithfully executes his duties, until the contrary be proved. And besides the constitutional provision just mentioned, the 7th section of the act under consideration expressly declares, that it shall be lawful for the president of the United States, or such other person as he shall have empowered for that purpose, to employ such part of the land or naval forces of the United States, or of the militia thereof, as shall be judged necessary for the purpose of preventing the carrying on of any such expedition or enterprize from the territories of the United States against the territories or dominions of a foreign prince or state with whom the United States are at peace. 3 Swift's Ed. 91, 92. The facts, however, which are disclosed in the defendant's affidavit, we must, in the discussion of the present question, take to be true in the manner therein set forth; and the objection goes to the invalidity, the inoperative virtue, and the unavailing nature of the facts themselves. Are the contents of the affidavit pertinent, are they material, are they relevant? The 5th section of the statute, on which the indictment is founded, is expressed in general, unqualified terms; it contains no condition, no exception; it vests no dispensing power in any officer or person whatever. Thus it reads: " And be it further enacted and declared, that if any person shall, within the territory or jurisdiction of the United States, begin or set on foot, or provide or prepare the means for any military expedition or enterprize to be carried on from thence against the territory or dominion of any foreign prince or state, with whom the United States are at peace, every such person, so offending, shall, upon conviction, be adjudged guilty of a high misdemeanor, and shall suffer fine and imprisonment at the discretion of the court, in which the conviction shall be had, so as that such fine shall not exceed three thousand dollars, nor the term of imprisonment be more than three years."

The section which I have read is declaratory of the law of nations; and, besides, every species of private and unauthorized hostilities is inconsistent with the principles of the social compact, and the very nature, scope and end of civil government. The statute, which is the basis of the present indictment, was passed the 5th of June, 1794, and was temporary; but congress found it expedient, and, perhaps, necessary to continue it in force, without limitation of time, which was done on the 24th of April, 1800. This 5th sec-

NEW-YORK,
1806.

The People
v.
Smith.

tion, which prohibits military enterprizes against nations with which the United States are at peace, imparts no dispensing power to the president. Does the constitution give it? Far from it; for it explicitly directs, that he shall " take care that the laws be faithfully executed." This instrument, which measures out the powers and defines the duties of the president, does not vest in him any authority to set on foot a military expedition against a nation, with which the United States are at peace. And if a private individual, even with the knowledge and approbation of this high and pre-eminent officer of our government, should set on foot such a military expedition, how can he expect to be exonerated from the obligation of the law? Who holds the power of dispensation?—True, a *nolle prosequi* may be entered, a pardon may be granted; but these presume criminalty, presume guilt, presume amenability to judicial investigation and punishment; which are very different from a power to dispense with the law. Supposing then that every syllable of the affidavit is true, of what avail can it be on the present occasion? Of what use or benefit can it be to the defendant in a court of law? Does it speak by way of justification? The president of the United States cannot controul the statute, nor dispense with its execution, and still less can he authorize a person to do what the law forbids. If he could, it would render the execution of the laws dependent on his will and pleasure ; which is a doctrine that has not been set up, and will not meet with any supporters in our government. In this particular, the law is paramount. Who has dominion over it? None but the legislature; and even they are not *without their limitation in our republic. Will it be pretended* that the president could rightfully grant a dispensation and license to any of our citizens to carry on a war against a nation with whom the United States are at peace? Ingenious and learned counsel may imagine, and put a number of cases in the wide field of conjecture ; but we are to take facts as we find them, and to argue from the existing state of things at the time. If we were at war with Spain, there is an end to the indictment; but, if at peace, what individual could lawfully make war or carry on a military expedition against the dominions of his Catholic Majesty? The indictment is founded on a state of peace, and such state is presumed to continue until the contrary appears. A state of war is not set up in the affidavit. If, then, the president knew and approved of the military expedition set forth in the indictment against a prince with whom we are at peace, it would not justify the defendant in a court of law, nor discharge him from the binding force of the act of congress ; because the president does not possess a dispensing power. Does he possess the power of making war? That power is exclusively vested in congress. For, by the 8th section of the 1st article of the constitution, it is ordained, that congress shall have power to declare war, grant letters of marque and reprisal, raise and support armies, provide and maintain a navy, and to provide for calling forth the militia to execute the laws of the union, suppress insurrections, and repel invasions. And we accordingly find, that congress have been so circumspect and provident in regard to the last three particulars, that they have from time to time vested the president of the United States with ample powers. Thus

by the act of the 28th of February, 1795, 3 Swift's Edition, 188.
it is made lawful for the president to call forth the militia to repel
invasions, suppress insurrections, and execute the laws of the union.
Abstractedly from this constitutional and legal provision, the right
to repel invasions arises from self-preservation and defence, which
is a primary law of nature, and constitutes part of the law of na-
tions. It therefore becomes the duty of a people, and particularly
of the executive magistrate, who is at their head, and commander-
in-chief of the forces by sea and land, to repel an invading foe.
But to repel aggressions and invasions is one thing, and to commit
them against a friendly power is another. It is obvious, that if the
United States were at war with Spain at the time that the defend-
ant is charged with the offence in the indictment, then he does not
come within the purview of the statute, which makes the basis of
the offence to consist in beginning or preparing the means to carry
on a military expedition or enterprize against a nation with which
the United States are at peace. If, indeed, a foreign nation should
invade the territories of the United States, it would, I apprehend,
be not only lawful for the president to resist such invasion, but also
to carry hostilities into the enemy's own country; and for this plain
reason, that a state of complete and absolute war actually exists
between the two nations. In the case of invasive hostilities, there
cannot be war on the one side, and peace on the other. What! in
the storm of battle, and, perhaps, in the full tide of victory, must
we stop short at the boundary between the two nations and give
over the conflict and pursuit? Will it be an offence to pass the line
of partition, and smite the invading foe on his own ground?
No; surely no. To do so would be a duty, and cannot be pervert-
ed into a crime. There is a manifest distinction between our go-
ing to war with a nation at peace, and a war being made against
us by an actual invasion, or a formal declaration. In the former
case, it is the exclusive province of congress to change a state of
peace into a state of war. A nation, however, may be in such a
situation as to render it more prudent to submit to certain acts of a
hostile nature, and to trust to negotiation for redress, than to make
an immediate appeal to arms. Various considerations may induce
to a measure of this kind; such as motives of policy, calculations
of interest, the nature of the injury and provocation, the relative
resources, means and strength of the two nations, &c. and, there-
fore, the organ entrusted with the power to declare war, should
first decide whether it is expedient to go to war, or to continue in
peace; and until such decision be made, no individual ought to
assume an hostile attitude; and to pronounce, contrary to the con-
stitutional will, that the nation is at war, and that he will shape his
conduct and act according to such a state of things. This con-
duct is clearly indefensible, and may involve the nation, of which
he is a member, in all the calamities of a long and expensive
war. It is a matter worthy of notice on the present occasion,
that when the offence laid in the indictment is stated to have
been committed, congress were in session; and if, in their esti-
mation, war measures were prudent or necessary to be adopted,
they would, no doubt, have expressed their sentiments on the sub-
ject, either by a public declaration of their will, or by authorizing

NEW-YORK,
1806.

The People
v.
Smith.

the executive authority to proceed hostilely against the king of Spain. But nothing of this kind has been done, or at least appears to have been done. Congress does not choose to go to war; and where is the individual among us, who could legally do so without their permission? Whoever violates the law becomes liable to its penalties; nor can the observance of the law be dispensed with, unless it contains a clause authorizing certain persons to dispense with it under specified circumstances, or whenever they may think it expedient. In the present case, if war had occurred between the United States and Spain at the time the facts stated in the indictment were committed, they would not amount to an offence within the statute, which relates to a time of tranquillity and peace. The defendant and his case would have been out of the statute. War is not pretended; and the law under consideration is absolute, requires universal obedience, and does not vest any officer with a dispensing power, or the extraordinary privilege of authorizing a person to do what it expressly prohibits. It appearing then that the testimony of Mr. Madison, Mr. Smith, Mr. Wagner and Mr. Thornton, as stated in the defendant's affidavit, is not pertinent to the issue, nor material by way of justification for defence against the facts charged in the indictment, their absence cannot operate as a legal excuse to put off the trial.

But it has been contended, that if the testimony offered should not amount to a justification, it will to a mitigation of the punishment, and ought to pass to the jury for the sake of reaching the ears of the judges. I take this to be incorrect in principle, so far as it regards criminal prosecutions. Why suffer evidence to go to the jury, that is not pertinent to the issue; that will not justify the defendant, nor prove his innocence, nor purge his guilt? Is it that the court may instruct the jury that they must not regard such evidence, because it is irrelevant? This would be a work of supererogation and inutility. Nor is this all; the evidence may warp their opinion, may mislead their judgment, and induce them to find an erroneous verdict. If they acquit in consequence of this improper testimony, would a new trial be granted? Evidence, which operates merely in mitigation of the punishment, is fit for the court only. If the defendant be convicted, then the question of mitigation arises, and will come properly before the judges. I have always taken the distinction to be between criminal and civil cases. On an indictment for a misdemeanor, where the punishment is discretionary, the jury are to determine whether the defendant be guilty or not of the charge exhibited against him; and it is the peculiar and exclusive province of the court to ascertain the punishment. The jury have no voice in fixing the punishment; and why should they hear evidence respecting it? In civil prosecutions, instituted to recover damages, as in an action for assault and battery, false imprisonment, evidence in mitigation should be addressed to the jury, because they are the legal constituted assessors of the quantum of damages. It is of the utmost importance to the due administration of justice, that the boundary between the province of the judges and the province of the jury, which is accurately marked by the law, should be inviolably preserved; it ought not to be broken in upon, as it would lead to confusion, and render our civil rights precarious.

The case of Anglesea, 9 State Trials, 335. has been cited to prove, that the vindictive temper and conduct of Anglesea, a day or two preceding the assault, were given in evidence, though strongly resisted by his counsel. This may have been proper in two points of view. 1. Because, according to the practice of Westminster-Hall, matter in aggravation, previously to the commission of the offence and conviction of the offender, are not usually laid before the court after conviction, in order to increase the punishment. This is a humane practice, and in favour of the offender. I say usually, because there may be some exceptions, or some anomalous cases to the contrary. 2. Because the previous conduct, and malicious spirit of Anglesea naturally led to the assault, were connected with it, and constituted one offence. It is usual to relate the circumstances attending the fact, which form no inconsiderable ingredient in the transaction, and are perfectly consistent with the nature of the case, and the issue.—What is it, but to set forth the special manner of the fact or offence ? In the case cited, it was the same person, it was the same offence. This case, therefore, is not applicable to the present, and cannot be assimilated to it.

Several passages were read in M'Nally's evidence, which went to show in what case the character of the prisoner may be given in evidence on his trial. Great relaxation of the old rule has of late years obtained, at least in the Irish courts of judicature ; for in a certain class of cases, the character of the defendant, when it bears on the issue, and goes to show the improbability of his having committed the fact laid in the indictment, is permitted to be given in evidence; as on indictments for seditious libels, for riots and assaults, for forgeries, &c. Let us hear the opinions of Lord Carlton, Lord Kilwarden, Baron Smith, and Lord Kenyon, 1 M'Nally's evidence, 321, 322, 323.

In The King v. John Brown, commission of oyer and terminer, Dublin, December, 1798. Before Lords Kilwarden and Carlton, chief justices The prisoner was indicted, at common law, for uttering a forged instrument, purporting to be a promissory note for money of Sir Thomas Lighton & Co.—The prisoner offered evidence of character ; which was objected to on the old rule, that evidence of character was only admissible in *favorem vitæ*, on capital charges, but the indictment here was not capital, but merely a misdemeanor. " Lord Carlton, C. J. Com. P. said, he had conversed with many of the judges on the subject now before the court, who thought, as he did, that in cases where character was put in issue, evidence of such a nature might be very material : for example, suppose a man of very great property was indicted for perjury, when the object to be obtained by the perjury was a mere trifle, for instance a shilling ; or suppose a man to be charged with a riot or assault, who was known to be of a peaceable and quiet disposition ; evidence of character in such cases, directly encountering the nature of the charge in the indictment, must be of the last importance. His Lordship then cited The King v. Robert Carr, Guildhall, London, 32 Car. 2. on an information for a libel against the government. Sir William Scroggs, who was the judge, and who was not likely to grant a prisoner, in such a case, any privilege that he was not entitled to, admitted the defendant to give evidence

of his character and deportment. Lord Chief Justice Holt, his Lordship observed, also admitted this species of evidence ; and all the judges in Ireland, upon the late circuits, uniformly received evidence of loyalty in cases where the charge was of a seditious nature, though amounting only in point of law to a misdemeanor.

" Lord Kilwarden, C. J. Ban. Reg. agreed with Lord Carlton, and observed, that the reason generally assigned for the admission of such evidence in capital cases, and in capital cases only, was altogether unsatisfactory to his mind. It was said to be in *favorem vitæ ;* but he had no conception, according to the principle of sound sense and right reason, that character could be evidence in a case affecting the life of a man, and yet not evidence in a case affecting his freedom, his property, and his reputation.

" In The King v. Crawley, commission of oyer and terminer, Dublin, February, 1802. W. Smith, B. in his charge to the jury, adverted to the evidence of good character, which had been given for the prisoner. Character, he said, is of great weight in every case, and requires particular attention when the charge is grounded on circumstantial evidence ; for it then creates a greater degree of doubt than where the prosecution is supported by direct evidence. In the former case, evidence of character ought to be particularly attended to, because the jury is more or less embarrassed, and called upon to weigh the case with more scruple and doubt, from the very nature of the testimony.

" Lord Kenyon's sentiment, though promulgated in a capital charge of the first magnitude, may be well applied to all cases, where the character of the defendant comes in issue. An affectionate and warm evidence of character, when collected together, should make a strong impression in favour of a prisoner, and when those who give such character in evidence are entitled to credit, their testimony should have great weight with the jury."

The reason assigned by the Irish judges, in favour of giving character in evidence on indictments for misdemeanors, when it bears on the issue, possesses great weight, and perhaps, irrefragable. I feel no disposition to controvert them, nor is it necessary to do so on the present occasion. Character had, in the cases cited, an immediate and powerful bearing on the facts in issue, and did not go merely in mitigation of the punishment.

" Downe, J. (1 M'Nally, 320.) admitted the prisoner to give evidence of character, as a fraud was charged, and the punishment was not certain, but discretionary." The first reason given by Judge Downe is solid, because character bears on the point of fraud ; but the sound reason I do not consider in the same light, for it appears to me to be unsound and incompatible with legal principles.

The suggestion, that the evidence should be permitted to pass to the jury, that they may determine whether the offender ought to be recommended for mercy, is utterly destitute of foundation. It does not merit a serious thought. The jurors are to hear such evidence as the court think pertinent and material, and nothing more. But if matters, which may induce the jury to recommend the offender to the pardoning power, should be received in evidence, I do not know where we are to stop, or how to draw a line between the ad-

NEW-YORK,
1806.

The People
v.
Smith.

mission and non-admission of testimony. We should be without land marks; and afloat on the ocean without any compass to direct our course.

2. The attachment. On this subject the judges disagree, or, as the statute expresses it, their opinions are opposed. When this happens, the judges do not assign any reason in favour of their respective opinions, but merely state the point of disagreement, that either party may carry it to the supreme court for ultimate decision, according to the 6th section of the act to amend the judicial system of the United States, passed the 29th of April, 1802.

One of the judges is of opinion, that the absent witnesses should be laid under a rule to show cause, why an attachment should not be issued against them. The other judge is of opinion, that neither an attachment in the first instance, nor a rule to show cause ought to be granted.

Immediately after the opinion of the court had been given, *Sanford* moved to bring on the trial.

*Hoffman* requested permission for the counsel of the defendant to confer a few minutes together.

*Morton* requested a few days' delay, or to the next term; he did it with great deference to the court, and should submit with silent respect to their decision. The ground on which this question had been argued by the gentlemen with whom he was joined, had great force on his mind, and he hoped the court would admit of a short delay. He farther requested that Mr. Smith's affidavit might be filed.

*Paterson, J.* The court have considered this point also, and determined that the trial should proceed. His own infirm state of health had for a moment inclined him to agree to a few days' delay, with the hope that he might then be able to sit on the trial; but he was convinced that he should not in that time be sufficiently recovered. He therefore relinquished the idea of delay on his own account; and he did not perceive any benefit which could result to the defendant by granting the application.

Judge *Paterson* then left the bench.